## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NORTH AMERICA'S BUILDING TRADES UNIONS, et al., | Case No. 1:25-cv-01070-RC |
| Plaintiffs, | Judge Rudolph Contreras |
| v. | |
| DEPARTMENT OF DEFENSE et al., | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... i

INTRODUCTION ......................................................................................................................... 1

BACKGROUND ........................................................................................................................... 3

I.   Project Labor Agreements ...................................................................................................... 3

II.  GSA and DoD's Class Exemptions ........................................................................................ 5

III. Procedural History ................................................................................................................. 7

LEGAL STANDARD ................................................................................................................... 8

ARGUMENT ................................................................................................................................ 8

I.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims ......................................... 8

    A.  Plaintiffs Lack Article III Standing ................................................................................. 8

        1.  Injury-in-Fact ........................................................................................................... 9

        2.  Causation ................................................................................................................ 14

        3.  Redressability ........................................................................................................ 15

    B.  Plaintiffs Are Unlikely to Succeed on the Merits on their APA claims ...................... 16

        1.  The Memos Are Not Final Agency Action ............................................................ 16

        2.  The Memos are Not Arbitrary, Capricious, or Contrary to Law ............................ 19

II.  Plaintiffs Cannot Demonstrate Irreparable Harm ................................................................ 23

III. The Balance of Equities Favors Defendants ........................................................................ 24

IV. Plaintiffs Should Be Ordered to Post Security in Connection with Any Preliminary
    Injunctive Relief and Any Preliminary Relief Should Be Stayed to Allow Consideration
    of Whether to Appeal ........................................................................................................... 25

CONCLUSION ........................................................................................................................... 26

# TABLE OF AUTHORITIES

## CASES

*Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the United States*,
   840 F. Supp. 2d 327 (D.D.C. 2012) ........................................................................ 23

*Alphapointe v. Dep't of Veterans Affs.*,
   475 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................... 12

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
   659 F.3d 13 (D.C. Cir. 2011) .................................................................................. 8

*Am. Libr. Ass'n v. FCC*,
   401 F.3d 489 (D.C. Cir. 2005) ............................................................................... 9

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................... 14, 16, 17

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
   462 U.S. 87 (1983) ................................................................................................ 21

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
   172 F. Supp. 2d 138 (D.D.C. 2001),
   *rev'd*, 295 F.3d 28 (D.C. Cir. 2002) ......................................................... 11, 14, 15

*CACI, Inc.-Fed. v. United States*,
   67 F.4th 1145 (Fed. Cir. 2023) .............................................................................. 13

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ............................................................................... 23

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948) .............................................................................................. 16

*City of New York v. Mickalis Pawn Shop, LLC*,
   645 F.3d 114 (2d Cir. 2011) .................................................................................. 25

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .............................................................................................. 14

*Cobell v. Norton*,
   391 F.3d 251 (D.C. Cir. 2004) ............................................................................... 8

*Combat Med., LLC v. Esper*,
    No. 1:19-CV-1609, 2020 WL 2115447 (E.D. Va. May 4, 2020) ............................................. 13

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008)............................................................................................................ 12

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
    76 F.3d 1212 (D.C. Cir. 1996)............................................................................................ 17

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999).............................................................................................. 26

*DynCorp Int'l, LLC v. United States*,
    10 F.4th 1300 (Fed. Cir. 2021) ......................................................................................... 21

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*,
    *928* F.3d 95 (D.C. Cir. 2019).......................................................................................... 8, 9

*Emery Worldwide Airlines, Inc. v. United States*,
    264 F.3d 1071 (Fed. Cir. 2001) ......................................................................................... 12

*Eskridge Rsch. Corp. v. United States*,
    92 Fed. Cl. 88 (2010) ......................................................................................................... 23

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)............................................................................................................ 22

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)............................................................................................................ 14

*Fisher-Cal Indus., Inc. v. United States*,
    839 F. Supp. 2d 218 (D.D.C. 2012),
    *aff'd*, 747 F.3d 899 (D.C. Cir. 2014)................................................................................ 13

*Fla. Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996)............................................................................................. 15

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006)............................................................................................. 17

*Gilday v. Dubois*,
    124 F.3d 277 (1st Cir. 1997) ............................................................................................. 25

*Hecate Energy LLC v. FERC*,
    126 F.4th 660 (D.C. Cir. 2025) ........................................................................................ 15

*Hill v. U.S. Dep't of the Interior*,
   699 F. Supp. 3d 1 (D.D.C. 2023),
   *appeal filed*, No.24-5011 (D.C. Cir. Jan. 19, 2024) ................................................................ 16

*Int'l Dark-Sky Ass'n, Inc. v. Fed. Commc'ns Comm'n*,
   106 F.4th 1206 (D.C. Cir. 2024) ................................................................ 22

*Johnson v. Becerra*,
   668 F. Supp. 3d 14 (D.D.C. 2023),
   *aff'd, 111* F.4th 1237 (D.C. Cir. 2024) ................................................................ 25

*LABAT-Anderson, Inc. v. United States*,
   65 Fed. Cl. 570 (2005) ................................................................ 21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................ 8, 9, 14, 15

*Meyer v. Bush*,
   981 F.2d 1288 (D.C. Cir. 1993) ................................................................ 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983) ................................................................ 22

*MVL USA, Inc. v. United States*,
   174 Fed. Cl. 437 (2025) ................................................................ 3, 18, 21, 22

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ................................................................ 17

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................ 8

*Payne v. Travenol Lab'ys, Inc.*,
   565 F.2d 895 (5th Cir. 1978) ................................................................ 25

*Reid v. Buttigieg*,
   No. CV 20-1262 (TJK), 2023 WL 2184549 (D.D.C. Feb. 23, 2023) ................................................................ 25

*Rochester Tel. Corp. v. United States*,
   307 U.S. 125 (1939) ................................................................ 17

*S. Cal. All. of Publicly Owned Treatment Works v. EPA*,
   8 F.4th 831 (9th Cir. 2021) ................................................................ 17, 18

*Sampson v. Murray*,
   415 U.S. 61 (1974) ................................................................ 23

*SEC v. Goble*,
   682 F.3d 934 (11th Cir. 2012) .................................................................... 25

*Sierra Club v. EPA*,
   955 F.3d 56 (D.C. Cir. 2020)...................................................................... 17

*Simon v. E. Ky. Welfare Rts. Org.*,
   426 U.S. 26 (1976) ............................................................................... 14, 15

*Town of Chester v. Laroe Ests., Inc.*,
   581 U.S. 433 (2017) .................................................................................... 12

*Tyler Constr. Grp. v. United States*,
   570 F.3d 1329 (Fed. Cir. 2009) ............................................................ 20, 24

*United Payors & United Providers Health Servs., Inc. v. United States*,
   55 Fed. Cl. 323 (2003) ............................................................................... 23

*United States v. Fausto*,
   484 U.S. 439 (1988)..................................................................................... 13

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).......................................................................................... 8

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985)................................................................... 23

## STATUTES

5 U.S.C. § 551(13) ......................................................................................... 16

5 U.S.C. § 702 ................................................................................................ 16

5 U.S.C. § 704 ................................................................................................ 16

5 U.S.C. § 706 .................................................................................................. 7

5 U.S.C. §706(2)(A)......................................................................................... 7

28 U.S.C. § 1491(b) ....................................................................................... 12

28 U.S.C. § 1491(b)(1) ............................................................................. 12, 13

29 U.S.C. § 158................................................................................................. 3

iv

41 U.S.C. § 101 ................................................................................................ 4

41 U.S.C. § 1302(a)–(b)(1) .............................................................................. 4

41 U.S.C. § 1303(a)(1) ..................................................................................... 4

Competition in Contracting Act, 41 U.S.C. § 3301 ....................................... 22


**RULES**

Fed. R. Civ. P. 65(c) ....................................................................................... 26

Fed. R. Civ. P. 65(d)(1)(B)–(C) ..................................................................... 24


**REGULATIONS**

48 C.F.R. § 1.102 ........................................................................................... 24

48 C.F.R. § 1.401(a) ....................................................................................... 20

48 C.F.R. § 1.402 ...................................................................................... 19, 20

48 C.F.R. § 1.404 ........................................................................................... 20

48 C.F.R. § 6.202(b)(1) .................................................................................. 21

48 C.F.R. § 6.302-7(c)(4) ............................................................................... 21

48 C.F.R. § 22.501 ....................................................................................... 4, 6

48 C.F.R. § 22.504(d)(1) ........................................................................... 18, 21

48 C.F.R. § 22.504(d)(1)(i)(D) .................................................................... 6, 19

48 C.F.R. § 22.504(d)(1)(ii) ....................................................................... 6, 19


**OTHER AUTHORITIES**

GSA, *Land Port of Entry Fact Sheet*, http://gsa.gov/real-estate/gsa-properties/land-ports-of-entry-and-the-bipartisan-infrastructure-law/land-port-of-entry-fact-sheet ............................... 6

GSA Off. of Governmentwide Pol'y, SPE Memo SPE-2025-05, *Class Exception to Requiring a Project Labor Agreement for Land Ports of Entry* (Feb. 12, 2025), https://www.gsa.gov/system/files/SPE-2025-05.pdf .................................................... 6, 18, 19

*Mem. Re. Use of Project Labor Agreements on Federal Construction Projects to the Heads of Executive Departments and Agencies*, No. M-24-06 (Dec. 18, 2023)....................................... 4

Under Sec'y of Def., DARS Tracking No. 2025-O0002, *Class Deviation — Waiver of Project Labor Agreement Requirements* (Feb. 7, 2025), https://www.acq.osd.mil/dpap/policy/policyvault/USA000250-25-DPCAP.pdf .............. *passim*

Under Sec'y of Def., DARS Tracking No. 2025-O0002, Revision 1 *Class Deviation — Waiver of Project Labor Agreement Requirements* (Apr. 23, 2025), https://www.acq.osd.mil/dpap/policy/policyvault/USA000893-25-DPCAP.pdf .............5, 11, 22

*U.S. Dep't of Defense, et al., Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects*, 88 Fed. Reg. 88,708 (Dec. 22, 2023) ........................................................................... 4

*Use of Project Labor Agreements for Federal Construction Projects*, Exec. Order No. 14,063, 87 Fed. Reg. 7,363 (Feb. 4, 2022). ........................................... *passim*

## INTRODUCTION

At its core, Plaintiffs' suit is an attempt to dictate the terms on which the government may contract for construction projects through rigid enforcement of an executive policy favoring the use of Project Labor Agreements ("PLAs"). To be certain, Executive Order 14,063 and its implementing regulations tip the scales toward agencies requiring contractors and unions to enter such agreements before submitting proposals on particularly large and complex government solicitations. The issue for Plaintiffs is that the Executive Order and its implementing regulations permit agencies to waive this requirement.

The Department of Defense ("DoD") and the General Services Administration ("GSA") have announced their intent to do just that in future solicitations. DoD announced this intent on a wholesale basis, while the GSA intends to waive the requirement for projects involving modernization of the country's Land Ports of Entry. Both agencies made this announcement in short memoranda instructing internal acquisition officers on how to amend current, and structure future, solicitations. Plaintiffs attack these two memos through the Administrative Procedure Act ("APA"), claiming they are contrary to Executive Order and, in the case of the DoD memo, arbitrary and capricious for lack of sufficient explanation.

Plaintiffs' claims fail, however, for much the same reason they claim the memos are insufficient. Boiled down, their primary complaint is that the Executive Order requires exemptions to be on a case-by-case—or solicitation-by-solicitation—basis and the class nature of the memos violates this imperative. But, for that same reason, the memos at issue do not cause Plaintiffs injury, or constitute final agency action. Rather, it is future solicitations that may, or may not, affect Plaintiffs' bargaining positions. Neither memo requires DoD or GSA to exempt a solicitation from the PLA requirement in a manner that was not already possible consistent with executive order and regulations. Plaintiffs therefore fail to meet their burden to establish cognizable injury

1

for standing purposes or irreparable injury for the purpose of their Motion for a Preliminary Injunction. They also do not identify final agency action, so their claims are not cognizable under the APA, nor do Plaintiffs identify any agency actions contrary to law necessary to succeed on the merits of the APA claims.

Plaintiffs' claims fail at the threshold for a second related reason. They can show no injury based on the memos' purported removal of a preference for PLAs. It is critical to recognize (1) that both DoD and GSA *will still consider bids with PLAs* in the future—they merely intend not to require PLAs; and (2) therefore, Plaintiffs' resulting position in future negotiations has not fundamentally changed as a result of the memos. Plaintiffs are not the contractors or project managers with whom the government contracts to build a project. They are the labor unions who supply the labor to the contractors. Plaintiffs have failed to show that contractors—who are not parties to this suit—will cease to negotiate PLAs with Plaintiffs based on a removal of a preference for PLAs. Again, neither memo prevents DoD or GSA from accepting bids that contain PLAs; PLAs are merely not required anymore. As such, Plaintiffs cannot show they are losing business based on DoD and GSA's actions, defeating their claims for standing and irreparable injury.

In short, it is not certain yet how the removal of a requirement to enter a PLA will affect future solicitations and Plaintiffs' future negotiations with contractors for those solicitations. As Plaintiffs themselves point out, the propriety of a PLA exemption is to be determined on an individual solicitation basis, and this Court neither has an individual solicitation before it nor the jurisdiction to review individual bid protests.

For all these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

## BACKGROUND

### I.  Project Labor Agreements

Project Labor Agreements are a form of collective bargaining agreement negotiated between construction contractors and labor unions that establish the terms and conditions of employment for a specific construction project.  *See* 29 U.S.C. § 158.  For over thirty years, successive presidential administrations have "ping-ponged" between encouraging and discouraging the use of PLAs in government contracting.  *MVL USA, Inc. v. United States*, 174 Fed. Cl. 437, 441 (2025); *see also id.* at 443–45 (outlining the history of PLA treatment by successive presidential administrations in executive orders).

On February 4, 2022, President Biden issued Executive Order 14,063.  *Use of Project Labor Agreements for Federal Construction Projects*, Exec. Order No. 14,063, 87 Fed. Reg. 7,363 ("PLA EO"); *see also* ECF No. 1-1.  The PLA EO directs agencies to require PLAs in all "large-scale" government construction projects subject to three exceptions.

The PLA EO defines "large-scale construction projects" as any Federal construction project for which the total estimated cost of construction exceeds $35 million.  PLA EO § 1(c).  The EO concluded that such large-scale projects "pose special challenges to efficient and timely procurement by the Federal Government."  *Id.* § 1(a).  Section 3 of the PLA EO frames the PLA requirement as a "presumption" in which agencies "shall require [subject to the EO's exceptions,] every contractor or subcontractor engaged in construction on the project to agree, for that project, to negotiate or become a party to a project labor agreement with one or more appropriate labor organizations."  *Id.* § 3.  Section 4 lays out the minimum requirements for each PLA.  *Id.* § 4.

The mandate, however, is not absolute.  The PLA EO provides three exceptions which "[a] senior [agency] official" may exercise for "a particular contract" by providing a written

explanation why one of the exceptions apply. *Id.* § 5. Those exceptions include situations in which:

 (a) "[r]equiring a project labor agreement on the project would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement." The EO provides several factors to examine under this exception, including that "[t]he agency's need for the project is of such an unusual and compelling urgency that a project labor agreement would be impracticable;"

(b) "[b]ased on an inclusive market analysis, requiring a project labor agreement on the project would substantially reduce the number of potential bidders so as to frustrate full and open competition[;]" and

(c) "[r]equiring a project labor agreement on the project would otherwise be inconsistent with statutes, regulations, Executive Orders, or Presidential Memoranda.

*Id.* § 5(a)–(c).

Finally, the PLA EO directs the Federal Acquisition Regulatory Council ("FAR Council") to propose amendments to the Federal Acquisition Regulation ("FAR") [1] to implement the EO. PLA EO § 8(a). In response, GSA, DoD, and NASA promulgated a final rule amending the FAR that was published on December 22, 2023. *See U.S. Dep't of Defense, et al., Federal Acquisition Regulation: Use of Project Labor Agreements for Federal Construction Projects*, 88 Fed. Reg. 88,708 (Dec. 22, 2023) ("PLA Rule"); *see also* ECF No. 5-4; 48 C.F.R. § 22.501, *et seq.* The PLA EO also directs the Office of Management and Budget ("OMB") to issue guidance to implement the EO's requirements. PLA EO § 8(b). Contemporaneous with the publication of the PLA Rule, OMB issued a memorandum for the heads of executive departments and agencies regarding implementation of the exceptions to the PLA directive. *Mem. Re. Use of Project Labor Agreements*

---

[1] The FAR Council is comprised of the Administrator for Federal Procurement Policy, GSA, DoD, and the National Aeronautics and Space Administration ("NASA"). *See* 41 U.S.C. §§ 101, 1302(a)–(b)(1). GSA, DoD, and NASA are statutorily authorized to jointly issue and maintain the FAR. *See* 41 U.S.C. § 1303(a)(1).

4

*on Federal Construction Projects to the Heads of Executive Departments and Agencies*, No. M-24-06 (Dec. 18, 2023); *see also* ECF No. 5-4.

## II.  GSA and DoD's Class Exemptions

Both DoD and GSA subsequently published class deviations/exemptions to the PLA requirement through separate memoranda.

DoD published its memo, signed by the Principal Director of Defense Pricing, Contracting, and Acquisition Policy, on February 7, 2025.  Under Sec'y of Def., DARS Tracking No. 2025-O0002, *Class Deviation — Waiver of Project Labor Agreement Requirements* (Feb. 7, 2025), https://www.acq.osd.mil/dpap/policy/policyvault/USA000250-25-DPCAP.pdf  ("DoD  Memo"); *see also* ECF No. 1-2.  As the title suggests, the DoD Memo is a class "deviation" or "waiver" of the PLA requirement and instructs DoD contracting officers to amend current solicitations and not to issue solicitations containing PLA requirements in the future.  DoD Memo at 1.

More specifically, although the first sentence of the DoD Memo proclaims that "contracting officers shall not use project labor agreements for large-scale construction projects," the second sentence clarifies the meaning of that prohibition by directing officers to "amend solicitations to remove project labor agreement *requirements*."  *Id.* at 1 (emphasis added).  Thus, the Memo instructs contracting officers not to include a PLA *requirement* in future solicitations, in accordance with the Memo's second sentence.  DoD will, however, still consider bidders who are signatories to a PLA for future large-scale construction projects.

On April 23, 2025, DoD published a Revised Memo, further clarifying these points.  *See* Under Sec'y of Def., DARS Tracking No. 2025-O0002, Revision 1 *Class Deviation — Waiver of Project     Labor     Agreement     Requirements* (Apr.     23,     2025), https://www.acq.osd.mil/dpap/policy/policyvault/USA000893-25-DPCAP.pdf  ("DoD  Revised Memo").  As the Revised Memo explains, it clarifies the "authorization to deviate from the project

labor agreement (PLA) requirements" including that "contracting officers shall issue solicitations without PLA requirements and remove PLA requirements from any pending solicitations." *Id.* The Revised Memo states in no uncertain terms, however, that contracting officers are "not prohibited from accepting an offer that includes or is based on pricing conditioned on a contractor-proposed PLA." *Id.* at 1–2.

GSA published its memo, signed by the Senior Procurement Executive in the Office of Acquisition Policy, on February 12, 2025. GSA Off. of Governmentwide Pol'y, SPE Memo SPE-2025-05, *Class Exception to Requiring a Project Labor Agreement for Land Ports of Entry* (Feb. 12, 2025), https://www.gsa.gov/system/files/SPE-2025-05.pdf ("GSA Memo"); *see also* ECF No. 1-3. The GSA Memo limits the waiver of the PLA requirement to Land Port of Entry ("LPOE") projects, which are projects involving facilities used to control entry and exit into the United States. *See* GSA, *Land Port of Entry Fact Sheet*, http://gsa.gov/real-estate/gsa-properties/land-ports-of-entry-and-the-bipartisan-infrastructure-law/land-port-of-entry-fact-sheet. In other words, the exemption applies to a limited category of construction projects for which GSA has determined that two of the exemptions outlined in the PLA EO and implementing regulations likely apply "[b]ased on recent historical projects and anticipated expedited timelines[.]" GSA Memo at 1. Specifically, GSA invoked (1) PLA EO Section 5(a)(v) (codified at 48 C.F.R. § 22.504(d)(1)(i)(D)), creating an exception for projects for which the agency's need is of such an unusual and compelling urgency that a PLA would be impractical, and (2) PLA EO Section 5(b) (codified at 48 C.F.R. § 22.504(d)(1)(ii)), citing market research indicating that requiring a PLA in such projects would "substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved." GSA Memo at 1–3.

### III. Procedural History

Plaintiffs filed suit on April 9, 2025.  Compl., ECF No. 1 ("Compl.").  Plaintiffs are a labor organization, which is itself composed of national and international unions, and a local council chartered by the labor organization, which is itself made up of local building and construction trades unions in the Maryland, Washington, D.C., and Northern Virginia areas.  Compl. ¶¶ 9–10. They allege injury based on the DoD and GSA Memos on the theory that they regularly enter PLAs with construction contractors who, in turn, bid on government solicitations, and that, but for the agencies' decisions not to require PLAs in future solicitations, they "would continue to negotiate and enter into PLAs."  *Id.* ¶ 38.

Plaintiffs' Complaint advances three causes of action, all under the Administrative Procedure Act, 5 U.S.C. § 706.  The first two charge DoD and GSA respectively with violating Section 706(2)(A) of the APA by issuing final agency action, in the form of their memos, which are "not in accordance with law" as contrary to the PLA EO and implementing regulations.  Compl. ¶¶ 57–64 (Count I – DoD); *id.* ¶¶ 65–70 (Count II – GSA).  The third count alleges that DoD acted arbitrarily and capriciously in violation of APA Section 706(2)(A) by not providing sufficient explanation of the reasons for the actions taken in the Memo.  *Id.* ¶¶ 71–76 (Count III).  Plaintiffs ask the Court to declare the memos unlawful and enjoin the agencies from enforcing them.  *Id.* ¶¶ A–B.

On April 10, 2025, Plaintiffs filed their currently pending Motion for a Preliminary Injunction.  Pls.' Mot. for Prelim. Inj., ECF No. 5 ("PI Mot."); Mem. in Supp. of Pls.' Mot. for Prelim. Inj., ECF No. 5-1 ("PI Memo").  In the Motion, Plaintiffs ask the Court to issue a preliminary injunction preventing the agencies from enforcing the Memos until a final decision on the merits.  PI Mot. ¶ 5.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). It is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

To warrant preliminary injunctive relief, the moving party must show (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities "tips in his favor," and (4) that an injunction is in the public interest. *Id.* at 20. Where the Government is the party opposing injunctive relief, as here, the latter two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims

#### A. Plaintiffs Lack Article III Standing

Plaintiffs have failed to establish the necessary Article III standing to bring this suit. At its "irreducible constitutional minimum," the standing doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).[2]

---

[2] Plaintiff North America's Building Trades Unions ("NABTU") claims standing both in its own right and on behalf of its members. Compl. at 4. An association can assert standing in two ways: "[i]t can assert standing on its own behalf, as an organization, or on behalf of its members, as associational standing." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 100 (D.C. Cir. 2019) (citing *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24

Here, Plaintiffs' fail on all three prongs.  The root of these failures, however, lies in a common core.  Plaintiffs' claim to standing is that they and their members regularly enter PLAs, and that they would continue to play a role in PLA negotiations, but the lack of government insistence on PLAs has either deprived them of the opportunity to negotiate and administer PLAs or disadvantaged them vis-a-vis their bargaining partners in future solicitations.  *See* Compl. ¶ 38; PI Memo at 4–7, 10–12, 12–15.  But the Memos themselves do not do the work Plaintiffs claim, and therefore establish no injury-in-fact, causation, or redressability.

### 1.  Injury-in-Fact

To establish an injury-in-fact, Plaintiffs must show an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, as opposed to merely conjectural or hypothetical.  *Lujan*, 504 U.S. at 560.  As the Supreme Court explained in *Lujan*, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending."  *Id.* at 564 n.2 (internal quotations and citations omitted).

---

(D.C. Cir. 2011)).  To establish standing on behalf of its members, NABTU must demonstrate that "(1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit."  *Id.* at 101 (quoting *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005)).  To fulfill this first prong, NABTU must demonstrate that one of its members fulfills the recognized Article III standing elements.  *Id.* (citing *Lujan*, 504 U.S. at 560).  NABTU's claim to injury on behalf of its members, however, is essentially the same as its own: its members, such as Baltimore-D.C. Metro Building and Construction Trades Counsel, would also continue to enter PLAs but for the DoD and GSA's Memos.  *See* PI Memo at 7, 13 n.11; Decl. of Sean McGarvey ¶ 13, ECF No. 5-2.  As such, both NABTU's claims for organizational and associational standing ride on whether the same harms claimed by itself and on behalf of its members meet the Article III standard.  Therefore, the Government addresses both claims to standing in one.

Here, Plaintiffs' injuries are just that: speculative. While the Memos announce that the agencies intend not to require PLAs in future solicitations, the Memos themselves are not the solicitations which require, or do not require, a PLA. Plaintiffs do not dispute, for example, that a future solicitation may omit a PLA requirement in a manner likely to meet the substantive requirements for an exception under the PLA EO and regulations. Nor could they, as the PLA EO unquestionably gives contracting authorities the ability to evaluate the PLA requirement on a contract-specific basis. Thus, it is left to be seen whether a contracting officer from one of the agencies removes a PLA requirement from a specific solicitation in a manner inconsistent with the PLA EO.

Further still, any impact on Plaintiffs' bargaining position in future negotiations is, at best, speculative. Construction bidders are still free to enter PLAs and bid on large-scale contracts, as neither Memo precludes consideration of a bid with a PLA. If PLAs deliver the efficiencies Plaintiffs claim, *see* Compl. ¶¶ 17–18; PI Memo at 2, contractors may still choose to enter them to make their offers more attractive based on those advantages despite the lack of requirement. It is therefore speculative whether Plaintiffs will be injured by the lack of a PLA requirement for certain contracts.

Plaintiffs' arguments to the contrary are unavailing. For example, Plaintiffs consistently argue that "[t]he memoranda have forced NABTU and its affiliates . . . out of the contracting process by not requiring contractors to turn to building trades unions to negotiate a PLA and, in the case of the DoD Memorandum, by precluding the use of PLAs on large-scale construction projects." PI Memo at 12–13.

Not so. Contractors are still able to enter PLAs with plaintiffs *and win contracts*, when their bids represent the best value offerings. Neither Memo states that bids with PLAs will not be

considered; they merely direct contracting officers to remove the *requirement* to have a PLA in solicitations.

While Plaintiffs focus on the first sentence of the original DoD Memo stating that "contracting officers *shall not use* project labor agreements for large-scale construction projects[.]" DoD Memo at 1 (emphasis added), the second sentence, is the operative instruction. It instructs contracting officers to "amend solicitations to remove project labor agreement requirements[.]" *Id.* Accordingly, the Memo does no more than instruct officers to remove the PLA requirements, not to forgo consideration of any bid or proposal with a PLA. This interpretation is confirmed by the Revised DoD Memo. *See* DoD Revised Memo at 1. Thus, contrary to their claims, Plaintiffs have not lost their place at the negotiating table; they remain free to attempt to demonstrate their value to the contractors that compete for DoD and GSA contracts and, by extension, to the Government itself.

Next, Plaintiffs' reliance on *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 172 F. Supp. 2d 138 (D.D.C. 2001) ("*BCTD*"), *rev'd*, 295 F.3d 28 (D.C. Cir. 2002), is similarly unavailing. In that case, BCTD challenged a specific solicitation which a previous executive order directly affected. *See BCTD*, 172 F. Supp. 2d at 144. As the court in that case explained while examining the plaintiff's claims to injury-in-fact, "[t]he loss of *that agreement* is a particularized and concrete harm to BCTD." *Id.* at 147 (emphasis added). Further, the court heavily relied on the "uncontroverted fact that plaintiffs regularly negotiated and entered PLAs with both public and private recipients of federal funding, and are *no longer able to do so* because of EO 13202" to support a finding of sufficient injury. *Id.* at 148 (emphasis added).

By contrast, in this case, Plaintiffs do not challenge a specific solicitation or project. They have also not been definitively locked out of any negotiations, as neither of the Memos themselves

solicit bids or proposals, either with, or without, a PLA requirement, or prevent future contractors from submitting bids or proposals with a PLA.

Finally, to the extent Plaintiffs point to two ongoing solicitations in their complaint and motion, *see* Compl. ¶¶ 53–54; PI Memo at 10–12, 14–15, Plaintiffs' suit does not challenge these specific solicitations. *See* Compl. ¶¶ 57–76 (outlining causes of action against the DoD and GSA Memos). Further, to the extent Plaintiffs tie their claims in this suit to those solicitations, both projects mentioned—one for a USDA Dairy Forage Research Center in Prairie du Sac, Wisconsin and the other for an enlisted quarters and a support facility at the Marine Barracks in Washington, D.C.—are DoD and U.S. Army Corps of Engineers projects. *See Id.* ¶¶ 53–54. Standing, however, "is not dispensed in gross" and Plaintiffs "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). As such, to the extent standing is dependent on an ongoing solicitation, Plaintiffs have failed to establish standing against the GSA.

Additionally, to the extent Plaintiffs seek to challenge the bid processes in those solicitations, the Court of Federal Claims, not this Court, has exclusive jurisdiction over bid protests. 28 U.S.C. § 1491(b); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1078–79 (Fed. Cir. 2001); *see also Alphapointe v. Dep't of Veterans Affs.*, 475 F. Supp. 3d 1, 8–12 (D.D.C. 2020). Seeking to avoid this result, Plaintiffs argue that they have demonstrated their claim to relief under the APA because they would not be considered "interested parties" in a Court of Federal Claims suit as they are not "actual or prospective bidders or offerors, and their challenge is not at its essence a contract claim." PI Memo at 17; *see also* 28 U.S.C. § 1491(b)(1) (providing

the Court of Federal Claims exclusive jurisdiction in "an action by an interested party objecting to a solicitation by a Federal agency").

This is accurate, but whether Plaintiffs qualify as "interested parties" under 28 U.S.C. § 1491(b)(1) is irrelevant to this Court's jurisdiction.  The jurisdictional question under 28 U.S.C. § 1491(b)(1) is whether a claim is brought "in connection with a procurement or proposed procurement." *Combat Med., LLC v. Esper*, No. 1:19-CV-1609, 2020 WL 2115447, at *6 (E.D. Va. May 4, 2020) (quoting 28 U.S.C. § 1491(b)(1)).  If so, the case falls within the "exclusive jurisdiction" of the Court of Federal Claims, and this Court may not entertain it.  *Fisher-Cal Indus., Inc. v. United States*, 839 F. Supp. 2d 218, 222-25 (D.D.C. 2012), *aff'd*, 747 F.3d 899 (D.C. Cir. 2014).  The question of whether a plaintiff is an "interested party" is "not jurisdictional" and is therefore to be decided by the Court of Federal Claims, not the District Court.  *Combat Med.*, 2020 WL 2115447,  at *10; *see also Fisher-Cal*, 839 F. Supp. 2d at 224–25 ("the plaintiff argues that the APA applies to his claims because he is not an 'interested party' under the terms of 28 U.S.C. § 1491(b)(1) . . . the Court need not resolve this issue because the matter is one that is more appropriately addressed by the Court of Federal Claims, which has exclusive jurisdiction to adjudicate the merits of the plaintiff's claims and whether the plaintiff has the ability to pursue them at all."); *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023) ("Our prior caselaw treating the interested party issue as a jurisdictional issue . . . is no longer good law in this respect.").  If the ultimate result is that Plaintiffs do not have a viable claim in the Court of Federal Claims because they are not an interested parties, then that is simply a result of Congress's remedial scheme.  *See, e.g.*, *United States v. Fausto*, 484 U.S. 439, 446–47 (1988).

In sum, Plaintiffs fail to establish injury-in-fact based on the speculative nature of their alleged injury.

### 2. Causation

To establish causation, Plaintiffs must demonstrate that there is a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. In other words, "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* at 560–61 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).

Neither Memo regulates Plaintiffs' actions. Instead, the Memos direct internal government officers on crafting the terms of future solicitations, which contractors—who are third-parties not before this Court—will compete under and who will, in turn, decide whether or not to enter a PLA with Plaintiffs based on how competitive a PLA will make a contractor's offer. This is an attenuated causal chain. As the Supreme Court has explained, "[w]hen [a] plaintiff is an unregulated party, causation 'ordinarily hinges on the response of the regulated (or regulable) third party to the government action or inaction [,]'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (quoting *Lujan*, 504 U.S. at 562), and plaintiffs "attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts[,]'" *id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Thus, Plaintiffs' causal chain is broken by the decision of their negotiating partners whether to continue to negotiate PLAs with Plaintiffs in future solicitations.

Again, reliance on *BCTD* is unavailing. *See BCTD*, 172 F. Supp. 2d at 149–54. That court determined that the plaintiff had established causation where, in a particular solicitation, the plaintiff demonstrated that the executive order at issue in that case created a "determinative or coercive effect" on the project coordinator's decision making. *Id.* at 149 (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). As the court explained, the plaintiff demonstrated that the decision not to enter a PLA was "actually caused by the federal government's threat to cease funding, and

only by that threat[.]" *Id.* at 150; *see also id.* ("BCTD has presented sufficient uncontroverted evidence here to prove that the State of Maryland's decision to forgo the PLA on the Woodrow Wilson Bridge Project was caused by the promulgation of EO 13202.").

Here, however, contractors are still able to enter PLAs with Plaintiffs.  They are merely not required to do so.  In doing so, they may consider a multitude of factors including the economic viability and competitiveness of their offers in the context of a specific solicitation, but this does not establish causation.  *See id.* ("In other situations involving conditional funding or financial incentives created by the federal government [and not involving instances where conditional funding is the 'actual and only reason for a recipient's decision'], when a decision-maker is faced with many factors, it may well be too speculative to hold that one factor caused a decision.").

At bottom, Plaintiffs' claims rest on speculation about whether third-party contractors will still want to negotiate PLAs with them in future solicitations.  This speculative chain, based on the independent considerations of the third-party contractors, fails to establish standing.

### 3. Redressability

Plaintiffs fail to establish that their alleged injury will likely be redressed by the relief they seek.  Again, to establish standing, a plaintiff must show it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38).  The redressability prong "examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff."  *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (en banc)).

In this case, Plaintiffs petition the Court to declare the Memos "unlawful" and permanently enjoin Defendants from enforcing them.  Compl. ¶¶ A–C.  But, as stated above, the Memos do not implement the recission of the PLA requirement, future solicitations do.  Thus, even if enjoined

from implementing the Memos, DoD and GSA may still issue solicitations without a PLA requirement in the future, as empowered to do by the PLA EO and its implementing regulations. As such, if Plaintiffs are injured by the omission of a PLA requirement in large-scale projects, the Court enjoining enforcement of these Memos will not redress Plaintiffs' alleged harms.

### B. Plaintiffs Are Unlikely to Succeed on the Merits on their APA claims

Plaintiffs are unlikely to succeed on the merits of their APA claims because the DOD and GSA Memos are not final agency actions. Instead, they merely direct agency officers to act in future solicitations, which themselves would constitute final agency action, albeit not necessarily subject to APA challenge in the District Court. Further, the Memos are not contrary to the PLA EO and implementing regulations, or arbitrary and capricious.

#### 1. The Memos Are Not Final Agency Action

The Administrative Procedure Act provides a cause of action to those "suffering legal wrong because of agency action[.]" 5 U.S.C. § 702. Only *final* agency action is reviewable, however. *Id.* § 704. That requirement has two distinct parts. *See Hill v. U.S. Dep't of the Interior*, 699 F. Supp. 3d 1, 18 (D.D.C. 2023), *appeal filed*, No. 24-5011 (D.C. Cir. Jan. 19, 2024). First, the action being challenged must be "agency action" recognized by the APA, which defines the term to include a specific "rule, order, license, sanction, relief, or the equivalent[.]" 5 U.S.C.§ 551(13).

More importantly in this case, the agency action must be "final." The Supreme Court has established a two-part test for finality. First, "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature[.]" *Bennett*, 520 U.S. at 177–78 (quoting *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). The APA itself excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]." 5 U.S.C. § 704.

16

Second, "the action must be one by which 'rights or obligations have been determined,'" or from which "'legal consequences will flow[.]'" *Bennett*, 520 U.S. at 177–78 (citation omitted). As the D.C. Circuit has explained, this prong of the *Bennett* test is measured by the "actual legal effect (or lack thereof) of the agency action in question on regulated entities." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). For example, the D.C. Circuit has found no final agency action where the challenged agency action "impose[d] no obligations, prohibitions or restrictions on regulated entities," and "[did] not subject them to new penalties or enforcement risks[.]" *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020).

The DoD and GSA Memos fail both prongs. Both are quintessentially intermediate or interlocutory actions because they direct government officials to take further action. *See DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) ("a nonfinal agency order as one, for instance, that 'does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action[.]'" (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939))); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 22 (D.C. Cir. 2006); *see also S. Cal. All. of Publicly Owned Treatment Works v. EPA*, 8 F.4th 831, 837 (9th Cir. 2021) ("*SCAPOTW*") ("We have previously recognized that an agency action is not final when subsequent agency decision making is necessary to create any practical consequences.").

The DoD Memo, for example, directs contracting officers to "amend solicitations to remove project labor agreements requirements[.]" DoD Memo at 1. By its own terms, it contemplates additional agency action in the actual emendation or exclusion in future solicitations. So too with the GSA Memo, which directs that contracting officers will no longer be "required to

include [the PLA requirement] in LPOE procurements."  GSA Memo at 3.  Again, it contemplates the procurements as being the final actions to effectuate the class exception.

That the solicitation itself is the final agency action is confirmed by context, given that the PLA EO and implementing regulations contemplate—as Plaintiffs point out—that exemptions are to be made in specific solicitations.  *See* PLA EO § 5; 48 C.F.R. § 22.504(d)(1).  It is the specific solicitation that includes the PLA requirement (or not).  Future DoD and GSA solicitations that omit a PLA requirement will likely still meet the substantive requirements for an exception under the PLA EO and regulations.  *Cf. MVL USA*, 174 Fed. Cl. at 470 (finding that, in a bid before that court, the PLA mandate issued in the solicitation functioned to "deny exceptions even when the agency itself commission[ed] data indicating an exception should be made." (citation omitted)).

Plaintiffs' claims fail on the second *Bennett* prong for much the same reason; their alleged injuries do not flow from the Memos.  The Memos do not purport to regulate Plaintiffs or the actions of anyone outside of internal government actors.

The Ninth Circuit's opinion in *SCAPOTW* is instructive.  In that case, the EPA issued guidance recommending a particular statistical methodology for assessing water toxicity.  *SCAPOTW*, 8 F.4th at 834–35.  Trade associations challenged the guidance, claiming it violated the APA.  The Ninth Circuit found that the guidance was not final agency action because "it create[ed] no concrete consequences on its own."  *Id.* at 837.  Instead, the court found, "permit holders are subject to concrete consequences only if a state or federal permit incorporate[d]" the guidance. *Id.*; *see also id.* at 839 ("Of course . . . permits themselves are final agency actions.  But plaintiffs have disclaimed any challenge to specific permits in this litigation[.]").

As in *SCAPOTW*, the Memos at issue in this case merely instruct contracting officers to remove a PLA requirement from future solicitations.  Just as the subsequent permits constituted

the final agency action in *SCAPOTW*, here the final solicitations would be the implementing act. Further still, the guidance is to merely remove or not include the PLA requirement. Contracting officers are still free to evaluate bids and proposals with PLAs much as the permitting officers in *SCAPOTW* were free to use the statistical methodology, or not.

Thus, Plaintiffs have failed to establish that the legal consequences they allege flow from the Memos.

## 2. The Memos are Not Arbitrary, Capricious, or Contrary to Law

Plaintiffs' main argument is that the Memos are contrary to law because they are improper class deviations, as the PLA EO and regulations require solicitation-specific determinations. *See* PI Memo at 17–20. As shown throughout, however, the Memos themselves are not the exempting vehicle. Both contemplate that future solicitations will exercise exceptions or deviations on individual solicitations. As such, the Memos are not contrary to law on these grounds.

Furthermore, the Memos are not otherwise contrary to law or arbitrary and capricious. The GSA Memo, for example, cites specific conditions regarding LPOE projects that the agency believes, in later solicitations, would warrant exceptions under the PLA EO and regulations. GSA Memo at 1–3 ("Basis for Granting Class Exceptions" citing 48 C.F.R. § 22.504(d)(1)(i)(D) and 48 C.F.R. § 22.504(d)(1)(ii)). Neither Plaintiffs' Complaint nor their Motion challenges the propriety of these explanations.

The DoD Memo is similarly not contrary to law. Plaintiffs, for example, argue that the DoD Memo represents an impermissible FAR class deviation as such deviations are "precluded by law, executive order, or regulation[,]" *i.e.*, the PLA EO. PI Memo at 18 (quoting 48 C.F.R. § 1.402).

FAR 1.402 permits agencies to issue deviations from the FAR—including class deviations pursuant to FAR 1.404—"[u]nless precluded by law, executive order, or regulation[.]" 48 C.F.R.

§ 1.402; *see also id.* § 1.404 (Class deviations).  Nothing in the PLA EO, however, "precludes" agencies from issuing deviations from its implementing regulations in accordance with FAR subpart 1.4.  In fact, the PLA EO and implementing regulations do not address FAR deviations at all.  Plaintiffs apparently read "precluded by" in FAR 1.402 to mean "inconsistent with," but plaintiffs provide no support for this reading, and such a reading would lead to self-defeating ends.  After all, FAR 1.402 cannot mean that agencies are precluded from issuing deviations that are inconsistent with the underlying regulation, as deviations are, by definition, inconsistent with the regulation they seek to deviate from.  Indeed, the FAR defines a deviation to include the "issuance or use of a policy, procedure, solicitation provision (see definition in 2.101), contract clause (see definition in 2.101), method, or practice of conducting acquisition actions of any kind at any stage of the acquisition process *that is inconsistent* with the FAR."  48 C.F.R. § 1.401(a) (emphasis added).

The PLA EO was plainly intended to be implemented through the FAR, 87 Fed. Reg. 7,363, 7,365, and nothing in the EO states or implies that agencies may not exercise their authority under the FAR to issue deviations to the FAR provisions implementing the EO.  Thus, the DoD Memo is not an impermissible class deviation on these grounds.

Similarly, contrary to Plaintiffs' arguments, PI Memo at 19–20, nothing in the PLA EO or its implementing regulations states that exceptions may not be granted on a class basis, such as the GSA and DoD Memos.  To be certain, the PLA EO and FAR do not specifically authorize class exceptions, but "the proper inquiry is not whether the FAR authorizes" class exceptions for the PLA requirement, "but whether there is any statutory or regulatory provision that precludes such" class exceptions.  *Tyler Constr. Grp. v. United States*, 570 F.3d 1329, 1333 (Fed. Cir. 2009).  The requirement that the senior procurement executive provide an explanation of why certain

conditions exist "with respect to the particular contract" does not preclude the senior procurement executive from making that determination for multiple contracts at once. 48 C.F.R. § 22.504(d)(1). In contrast, other provisions of the FAR specifically preclude class exceptions to certain requirements, *see, e.g.*, 48 C.F.R. § 6.202(b)(1); *id.* § 6.302-7(c)(4), which indicates that class exceptions to the PLA requirements are permissible. *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1312–13 (Fed. Cir. 2021). Plaintiffs have failed to demonstrate a likelihood that the DoD and GSA Memos are contrary to law on these grounds.[3]

Next, Plaintiffs' arguments that the DoD Memo is arbitrary and capricious because DoD provided "no explanation whatsoever for why a class deviation [was] necessary" is also unavailing. PI Memo at 21; *see also* Compl. ¶ 75. In a contemporaneous memorandum, DoD explained that the "class deviation is urgently needed to enable contracting officers to conduct procurement activity related to large-scale construction projects in a manner consistent with the [Court of Federal Claims] ruling in [*MVL USA, Inc. v. United States*, 174 Fed. Cl. 437 (2025)] and based upon the results of market research." DARS Tracking No. 2025-O0002, *Mem. for Director, Defense Acquisition Regulations System – Determination of Urgency* (Feb. 7, 2025), Decl. of Benjamin S. Kurland, Ex. A, ECF No. 14-2 ("Urgency Determination Memo"). An agency's decision need only be "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983). Courts examine several factors in determining

_____

[3] Additionally, Plaintiffs' argument that DoD's FAR class deviation is inconsistent with the PLA EO must be rejected because the Executive Order is not judicially enforceable against DoD. *See* PLA EO § 13(c) ("This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person."); *see also Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993); *LABAT-Anderson, Inc. v. United States*, 65 Fed. Cl. 570, 580 (2005).

whether an agency decision was arbitrary and capricious, laid out in *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 43 (1983).

Here, a recent court decision in the Court of Federal Claims found DoD violated the Competition in Contracting Act, 41 U.S.C. § 3301, by including PLA requirements in several solicitations, *MVL USA*, 174 Fed. Cl. at 467–70. As the Urgency Determination Memo recognized, while the decision only directly affected the solicitations at issue in that case, it was likely the reasoning would "affect . . . additional protests and other solicitations not yet issued." Urgency Determination Memo at 1. The bids at issue in *MVL USA*, for example, were expected to be delayed "from three to six months, because each must be resolicited without the PLA requirements." *Id.* At the time, DoD assessed that it had more than twenty similar projects out for solicitation that could be affected, and which would close in the next several months. *Id.* Therefore, to prevent future delays in large-scale projects, DoD announced its intent, through the DoD Memo, to exempt future large-scale projects from the PLA requirement. The Revised DoD Memo adopts these same considerations in authorizing contracting officials to issue solicitations without PLA requirements in future solicitations. *See* DoD Revised Memo at 1. Preventing almost certain costly delay to future large-scale DoD construction projects is a reasonable basis for the agency decision making. *See State Farm*, 463 U.S. at 43 (agency fulfills "narrow" scope of judicial review where it examines the relevant issue and "articulates a satisfactory explanation for its action[.]"); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) ("a court is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (internal quotations and citations omitted)); *Int'l Dark-Sky Ass'n, Inc. v. Fed. Commc'ns Comm'n*, 106 F.4th 1206, 1213 (D.C. Cir. 2024) ("Within an agency's lawful authority, courts will uphold agency action that is reasonable

and reasonably explained." (internal quotations and citations omitted)); *see also Eskridge Rsch. Corp. v. United States*, 92 Fed. Cl. 88, 97 (2010) (maintaining awardee performance during corrective action not unreasonable to avoid delays in project); *United Payors & United Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 329 (2003) (courts defer to agency when agency makes decisions based on projected project costs).

## II. Plaintiffs Cannot Demonstrate Irreparable Harm

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

"The irreparable injury requirement erects a very high bar for a movant." *Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the United States*, 840 F. Supp. 2d 327, 334 (D.D.C. 2012) (citation omitted). "To demonstrate irreparable injury, a plaintiff must show that it will suffer harm that is 'more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff.'" *Id.* (citation omitted). "The 'alleged injury must be certain, great, actual, and imminent.'" *Id.* (citation omitted).

Plaintiffs cannot establish irreparable injury for much the same reason that they cannot establish standing. As laid out in the Preliminary Injunction Memo, Plaintiffs' claims to injury are much the same as their claims to Article III standing, namely that without relief from the DoD and GSA Memos they would be "deprive[d] [] of the opportunity to negotiate and administer PLAs." PI Memo at 21–22.

But, as explained above, the Memos themselves do not deprive Plaintiffs of the opportunity to negotiate PLAs. Indeed, both agencies will continue to consider bids and proposals with PLAs in large-scale construction contracts. Further still, as explained above, it is not these Memos, but prospective government contractors' decisions about whether to negotiate a PLA for particular contracts that will affect Plaintiffs. Accordingly, Plaintiffs have failed to demonstrate irreparable harm.

## III. The Balance of Equities Favors Defendants

Finally, the balance of equities favors the government. While the Plaintiffs are not injured by the Memos, the government would be injured by an injunction.

The Government unquestionably has "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation." *Tyler Constr.*, 570 F.3d at 1334. Indeed, the Federal Acquisition Regulations are designed to "deliver on a timely basis the best value product or service to the customer, while maintaining the public's trust and fulfilling public policy objectives" and empower acquisition teams "to exercise personal initiative and sound business judgment in providing the best value product or service to meet the customer's needs." 48 C.F.R. § 1.102.

Plaintiffs' requested relief would, in essence, hamstring DoD and GSA procurement officers into requiring PLAs in future actions, regardless of whether an exception is warranted. This impermissibly interferes with those officers' discretion to evaluate a contractor's bid—either with or without a PLA—in the context of specific bids or proposals.

This is because the terms of Plaintiffs proposed Preliminary Injunction are unclear. Specifically, Federal Rule of Civil Procedure 65 requires that Preliminary Injunctions "state [their] terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P 65(d)(1)(B)–(C). Plaintiffs' proposed injunction, however, would merely have the

Court prevent DoD and GSA from "taking any action whatsoever to implement or enforce the [Memos.]"  Proposed Order Granting Pls.' Mot. for a Prelim. Inj. at 2, ECF No. 5-13.  But, as described above, the Memos merely direct internal procurement officers to act in future solicitations.  Those actions, exempting solicitations from a PLA requirement, may still be done in a manner perfectly consistent with the PLA EO and implementing regulations' requirements.

It is unclear whether Plaintiffs are asking the Court to require DoD and GSA to require PLAs.  This cannot be the case as even the PLA EO grants agencies the authority to make exemptions and procurement officers are afforded discretion to exercise their business judgment in the procurement process.  To the extent Plaintiffs merely ask the Court to order the agencies to continue to implement the PLA EO and its requirements, including the ability to exempt individual solicitations, this too is an impermissible "obey the law" injunction.  *See Johnson v. Becerra*, 668 F. Supp. 3d 14, 21 (D.D.C. 2023) (citation omitted), *aff'd*, 111 F.4th 1237 (D.C. Cir. 2024); *Reid v. Buttigieg*, No. CV 20-1262 (TJK), 2023 WL 2184549, at *9 (D.D.C. Feb. 23, 2023); *see also Payne v. Travenol Lab'ys, Inc.,* 565 F.2d 895, 897 (5th Cir. 1978); *SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012); *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011); *Gilday v. Dubois*, 124 F.3d 277, 287 (1st Cir. 1997).

At base the lack of clarity in Plaintiffs' request tips the balance of equity scales against an injunction that would either inhibit the government's ability to issue legal solicitations or merely instruct it to follow the law.

## IV. Plaintiffs Should Be Ordered to Post Security in Connection with Any Preliminary Injunctive Relief and Any Preliminary Relief Should Be Stayed to Allow Consideration of Whether to Appeal

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiffs' Motion in its entirety.  However, should the Court be inclined to order any injunctive relief, the Court should order security with any preliminary injunction.  Under Federal Rule of

Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

## CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

<div style="margin-left:40%">

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

LESLEY FARBY
Deputy Director
Civil Division, Federal Programs Branch

Benjamin S. Kurland
Trial Attorney (D.C. Bar Reg. No. 1617521)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel: (202) 598-7755
Fax: (202) 616-8460
E-mail: ben.kurland@usdoj.gov

</div>

*Counsel for Defendants*