# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **North America's Building Trades Unions, et al.,** | |
| *Plaintiffs,* | |
| v. | No. 1:25-cv-01070-RC |
| **Department of Defense, et al.,** | |
| *Defendants.* | |

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Jonathan D. Newman (D.C. Bar No. 449141)
Lucas R. Aubrey (D.C. Bar No. 982849)
Jacob J. Demree (D.C. Bar No. 90012042)
Erich H. Lange (D.C. Bar No. 90019794)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
aubrey@shermandunn.com
demree@shermandunn.com
lange@shermandunn.com

May 2, 2025

**TABLE OF CONTENTS**

Table of Authorities ...................................................................................................iii

Argument ............................................................................................................... 1

    I.      Defendants Mischaracterize Executive Order 14063. ............................ 1

    II.    Plaintiffs Have Established that They Have Article III Standing......... 6

          A.    The Adverse Change to Plaintiffs' Bargaining Position Is
                a Cognizable Injury-in-Fact. ......................................................... 6

          B.    Plaintiffs' Diminished Bargaining Power Is Caused by
                Defendants' Memoranda and Would Be Redressed by an
                Injunction.................................................................................... 10

    III.   Plaintiffs Are Likely to Succeed on the Merits. ................................... 12

          A.    The DOD and GSA Memoranda Are Final Agency Actions
                Because They Mark the Agencies' Last Word on the
                Matter and Have Legal Consequences. ..................................... 12

          B.    Defendants' Memoranda Are Contrary to Law. ......................... 16

          C.    DOD's Memorandum Is Arbitrary and Capricious. ................... 22

    IV.   Defendants Do Not Dispute that Diminished Bargaining Power
          Is Irreparable Harm.............................................................................. 23

    V.    Defendants Pervert the Plain Language of Plaintiffs' Proposed
          Order to Skew the Balance of Equities. ................................................ 24

    VI.   This Court Should Not Require Plaintiffs to Post Security.................. 24

Conclusion............................................................................................................ 25

Certificate of Service............................................................................................

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*AFGE v. FLRA,*
  25 F.4th 1 (D.C. Cir. 2022)................................................................................ 7

*AIDS Vaccine Advoc. Coal. v. Dep't of State,*
  ___ F. Supp. 3d ___, 2025 U.S. Dist. LEXIS 42875 (D.D.C. Mar. 10,
  2025) ............................................................................................................... 9

*ALPA v. Chao,*
  889 F.3d 785 (D.C. Cir. 2018) ........................................................................ 10

*Am. First Legal Found. v. Becerra,*
  No. 24-cv-1092, 2024 U.S. Dist. LEXIS 141534 (D.D.C. Aug. 9, 2024)........... 25

*Ass'n for Women in Sci. v. Califano,*
  566 F.2d 339 (D.C. Cir. 1977) ........................................................................ 22

*Auer v. Robbins,*
  519 U.S. 452 (1997) ........................................................................................ 21

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................... 10, 13-14

*Bowen v. Georgetown Univ. Hosp.,*
  488 U.S. 204 (1988) ........................................................................................ 21

*Burlington Truck Lines v. United States,*
  371 U.S. 156 (1962) ........................................................................................ 23

*City of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ........................................................................ 21

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ....................................................................................... 7-8

*Crowley Gov't Servs., Inc. v. GSA,*
  38 F.4th 1099 (D.C. Cir. 2022)......................................................................... 9

*Del. Valley Reg'l Ctr., LLC v. DHS,*
  106 F.4th 1195 (D.C. Cir. 2024)..................................................................... 15

*Fund for Animals, Inc. v. BLM*,
  460 F.3d 13 (D.C. Cir. 2006) ...................................................................... 14

*ILGWU v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983) ................................................................... 23

*In re Glob. Indus. Techs., Inc.*,
  645 F.3d 201 (3d Cir. 2011) (en banc) ............................................................ 7

*Int'l Bhd. of Teamsters v. DOT*,
  724 F.3d 206 (D.C. Cir. 2013) ................................................................... 10

*Mass. Coal. for Immigr. Reform v. DHS*,
  621 F. Supp. 3d 84 (D.D.C. 2022) .............................................................. 13

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ..................................................................... 9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................. 23

*MVL USA, Inc. v. United States*,
  174 Fed. Cl. 437 (2025) ................................................................ 18-19, 21-22

*Nat'l Council of Nonprofits v. OMB*,
  ___ F. Supp. 3d ___, 2025 U.S. Dist. LEXIS 18824 (D.D.C. Feb. 3,
  2025) ............................................................................................... 11-12

*NLRB v. Iron Workers Loc. 103*,
  434 U.S. 335 (1978) ................................................................................. 4

*Nova Plumbing, Inc. v. NLRB*,
  330 F.3d 531 (D.C. Cir. 2003) ..................................................................... 3

*NRDC v. EPA*,
  643 F.3d 311 (D.C. Cir. 2011) .................................................................... 14

*NRDC v. Morton*,
  337 F. Supp. 167 (D.D.C. 1971) .................................................................. 25

*NTEU v. Chertoff*,
  452 F.3d 839 (D.C. Cir. 2006) .................................................................... 7-8

*Permapost Prods., Inc. v. McHugh*,
  55 F. Supp. 3d 14 (D.D.C. 2014) ................................................................. 10

*Pub. Emps. for Env't Resp. v. NPS,*
No. 19-cv-3629, 2021 U.S. Dist. LEXIS 60097 (D.D.C. Mar. 30, 2021) ..... 14-15

*S. Cal. All. of Publicly Owned Treatment Works v. EPA,*
8 F.4th 831 (9th Cir. 2021) ........................................................ 14-15

*Spirit Airlines, Inc. v. DOT,*
997 F.3d 1247 (D.C. Cir. 2021) ............................................................ 15

*United States v. Philip Morris USA, Inc.,*
566 F.3d 1095 (D.C. Cir. 2009) (per curiam).................................... 24

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001) ............................................................................ 13

## Statutes

29 U.S.C. § 152(5) ............................................................................... 3

29 U.S.C. § 158(f) .............................................................................. 3-4

41 U.S.C. § 1707(d) ............................................................................ 23

## Other Authorities

*4K Global-ACC JV, LLC*, B-423092.2 (Comp. Gen. Apr. 11, 2025),
https://www.gao.gov/assets/880/876975.pdf (last visited May 2, 2025) ..... 21-22

Executive Order 14063, 87 Fed. Reg. 7,363 (Feb. 9, 2022) ................................*passim*

FAR 1.402, 48 C.F.R. § 1.402 ............................................................ 18

FAR 22.503(a), 48 C.F.R. § 22.503(a)................................................. 1

FAR 22.503(b), 48 C.F.R. § 22.503(b)................................................. 2

FAR 22.503(c), 48 C.F.R. § 22.503(c)................................................. 5

FAR 22.504(d), 48 C.F.R. § 22.504(d)............................................. 2-3

FAR 22.504(d)(1), 48 C.F.R. § 22.504(d)(1) ...................................... 2

FAR 22.504(d)(1)(ii), 48 C.F.R. § 22.504(d)(1)(ii)........................... 20

FAR 22.504(d)(3), 48 C.F.R. § 22.504(d)(3)................................. 2, 17

Fed. R. Civ. P. 65(c) ................................................................................................ 25

Federal Acquisition Regulation: Use of Project Labor Agreements for Federal
    Construction Projects, 88 Fed. Reg. 88,708 (Dec. 22, 2023) (codified at
    FAR pts. 1, 7, 22, 36, and 52)................................................................*passim*

GSA Off. of Governmentwide Pol'y, SPE Memo SPE-2025-05, *Class Exception
    to Requiring a Project Labor Agreement for Land Ports of Entry* (Feb.
    12, 2025) ..................................................................................... 13, 19-21

Off. of the Under Sec'y of Def., DARS Tracking No. 2025-O0002, *Class
    Deviation — Waiver of Project Labor Agreement Requirements* (Apr. 23,
    2025), https://www.acq.osd.mil/dpap/policy/policyvault/USA000893-25-
    DPCAP.pdf (last visited May 2, 2025).....................................................*passim*

Off. of the Under Sec'y of Def., DARS Tracking No. 2025-O0002, *Class
    Deviation — Waiver of Project Labor Agreement Requirements* (Feb. 7,
    2025) ................................................................................................ 17

U.S. Const. art. III ............................................................................................. 6-7

## ARGUMENT

### I.   Defendants Mischaracterize Executive Order 14063.

Defendants' opposition brief is based on two false premises.  First, that there is no difference between an order that requires government contractors to construct large-scale construction projects using a project labor agreement ("PLA"), absent an exception for a particular project, and a policy that is agnostic towards whether government contractors use a PLA for such projects.  Second, that so long as it is still possible for Plaintiffs to negotiate PLAs for large-scale federal construction projects, Plaintiffs have suffered no harm notwithstanding Defendants' refusal to comply with Executive Order 14063 ("E.O.").  By mischaracterizing the E.O. and Plaintiffs' harm, Defendants arrive at the remarkable conclusion that their memoranda directing contracting officers to ignore the E.O. are nevertheless consistent with the E.O.

Defendants' arguments collapse upon a review and analysis of the plain text of the E.O. and its implementing regulations.  And Defendants' lawless refusal to comply with a binding E.O. has resulted in an adverse change in Plaintiffs' bargaining position, which has led, and will continue to lead, to concrete irreparable harm to Plaintiffs.

Section 1(c) of the E.O. states that, "it is the policy of the Federal Government for agencies to use project labor agreements in connection with large-scale construction projects to promote economy and efficiency in Federal procurement."  McGarvey Decl. Ex. A, 87 Fed. Reg. at 7,363.  The regulations implementing the E.O. also state the policy with respect to PLAs is that they are required for large-scale construction projects.  McGarvey Decl. Ex. C, 88 Fed. Reg. at 88,727, 48 C.F.R. § 22.503(a).

1

To effectuate that policy, Section 3 of the E.O. directs that, subject to certain exceptions, "agencies **_shall require_** every contractor or subcontractor . . . to negotiate or become a party to a project labor agreement with one or more appropriate labor organizations."  McGarvey Decl. Ex. A, 87 Fed. Reg. at 7,364 (emphasis added); Ex. C, 88 Fed. Reg. at 88,727, 48 C.F.R. § 22.503(b) ("[A]gencies shall require use of project labor agreements . . . unless an exception . . . applies.").

The exceptions to the E.O.'s PLA requirement are narrow and must be considered for, and tailored to, a particular construction project.  Section 5 of the E.O. provides that, "[a] senior official within an agency may grant an exception . . . for a **_particular contract_** by, **_no later than the solicitation date_**, providing a written explanation of why at least one" of the particular reasons for an exception "exists **_with respect to that contract_**."  McGarvey Decl. Ex. A, 87 Fed. at 7,364 (emphases added).  Thus, the FAR implementing regulations state that a senior procurement executive may grant an exception "with respect to [a] particular contract" for certain reasons, but must do so "by the solicitation date."  McGarvey Decl. Ex. C, 88 Fed. Reg. at 88,727-28, 48 C.F.R. §§ 22.504(d)(1) & (3).[1]

---

[1]    An exception may be made with respect to a particular project if:

     (i) Requiring a project labor agreement on the project would not advance the Federal Government's interests in achieving economy and efficiency in Federal procurement. The exception shall be based on one or more of the following factors:
     (A)    The project is of short duration and lacks operational complexity.
     (B)    The project will involve only one craft or trade.

2

Accordingly, the E.O. establishes a presumption that a PLA must be used unless an exception is issued for a particular project. Section 2(e) of the E.O. defines "project labor agreement" as "a pre-hire collective bargaining agreement with one or more labor organizations that establishes the terms and conditions of employment for a specific construction project and is an agreement described in 29 U.S.C. 158(f)." McGarvey Decl. Ex. A, 87 Fed. at 7,364. Section 2(a) defines a "labor organization" with which a contractor must enter into a PLA under the E.O. as "a labor organization as defined in 29 U.S.C. 152(5) of which building and construction employees are members, as described in 29 U.S.C. 158(f)." *Id.* at 7,363.

Section 8(f) agreements are pre-hire agreements and the statutory obligation to bargain under the National Labor Relations Act does not apply to their negotiation. *C.f. Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 534 (D.C. Cir. 2003) (no duty to bargain a Section 8(f) agreement after it expires). Instead, Section 8(f) pre-hire

---

(C)    The project will involve specialized construction work that is available from only a limited number of contractors or subcontractors.

(D)    The agency's need for the project is of such an unusual and compelling urgency that a project labor agreement would be impracticable.

(ii)    Market research indicates that requiring a project labor agreement on the project would substantially reduce the number of potential offerors to such a degree that adequate competition at a fair and reasonable price could not be achieved. A likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage under this authority unless it is coupled with the finding that the reduction would not allow for adequate competition at a fair and reasonable price.

(iii)    Requiring a project labor agreement on the project would otherwise be inconsistent with Federal statutes, regulations, Executive orders, or Presidential memoranda.

McGarvey Decl. Ex. C., 88 Fed. Reg. at 88,727-28, 48 C.F.R. § 22.504(d).

3

agreements are voluntary in nature and are entered into between employers in the construction industry and labor organizations like Plaintiffs of which building and construction employees are members.  29 U.S.C. § 158(f); *NLRB v. Iron Workers Loc. 103*, 434 U.S. 335, 348 n.10 (1978) (Section 8(f) agreements are voluntary in nature.). Because a PLA is voluntary in nature, by requiring contractors on large-scale construction projects to enter into a PLA, absent an exception, the E.O. gives the Plaintiffs a bargaining chip that does not exist without the E.O. when Plaintiffs are seeking to enter into a PLA with a government contractor.

Defendants ignore the structure of the E.O. and the bargaining chip that it gives by asserting that, "[f]uture DoD and GSA solicitations that omit a PLA requirement will likely still meet the substantive requirements for an exception under the PLA EO and regulations."  Defs.' Mem. 18.  That is true, according to Defendants, even if they "issu[e] deviations from [the E.O.'s] implementing regulations."  *Id.* at 20.  Defendants are fundamentally wrong to assume that all future solicitations for large-scale projects would be issued without a PLA requirement if the E.O. was followed.  Though an exception may apply in a particular case, the E.O. *presumes* that solicitations for large-scale projects will include PLA requirements.

Defendants turn that presumption on its head, and assert that their memoranda are consistent with the E.O. because "both DoD and GSA will still consider bids with PLAs in the future."  Defs.' Mem. 2.  Taken to its logical conclusion, Defendants' contention is that if the entire Federal Government ignored and refused to comply with the E.O., so long as it did not ban the use of PLAs on large-scale projects, there

4

would be no effect because, although PLAs would no longer be required, they would not be prohibited. That raises the question, what then is the point of the E.O.? The answer of course is that it implements a policy where the Federal Government is not agnostic about the use of PLAs on its projects, but rather, one where PLA use is required except under limited exceptions that may be granted on a project-by-project basis.

The fallacy in the argument that there is no difference between a policy that is neutral on whether PLAs should be used and one that presumes their use is illustrated by comparing Sections 3 and 7 of the E.O. As set forth above, Section 3 states that agencies "shall require" that a PLA be used subject to a particular contract qualifying for a limited exception under Section 5. Section 7 of the E.O., on the other hand, states that although PLAs are not required on projects that are not covered by the E.O., *i.e.*, on projects that do not meet the "large-scale" threshold of $35 million, the use of PLAs on such projects is not prohibited. McGarvey Decl. Ex. A, 87 Fed. Reg. at 7,364-65; *see also* Ex. C, 88 Fed. Reg. at 88,727, 48 C.F.R. § 22.503(c) (implementing regulation for E.O. § 7).

The class-wide deviation issued by the Department of Defense ("DOD") and the class exception issued by the General Services Administration ("GSA") essentially delete Sections 3 and 5 of the E.O. and leave Section 7 intact by allowing, but not requiring, PLAs. By eliminating the PLA presumption set forth in Section 3 of the E.O., the harm to the Plaintiffs is anything but theoretical, the actions of the DOD and GSA are final and contrary to law, and in the case of the DOD, are arbitrary and

5

capricious.[2]

## II.    Plaintiffs Have Established that They Have Article III Standing.

### A.    *The Adverse Change to Plaintiffs' Bargaining Position Is a Cognizable Injury-in-Fact.*

Defendants argue that Plaintiffs' injury is "speculative" because "[c]onstruction bidders are still free to enter PLAs and bid on large-scale contracts, as neither [DOD nor GSA's] Memo precludes consideration of a bid with a PLA." Defs.' Mem. 10. But whether construction bidders are still free to enter PLAs and bid on large-scale construction projects solicited by DOD and GSA is irrelevant. Plaintiffs assert that DOD and GSA's memoranda are contrary to law (and therefore violate the Administrative Procedure Act ("APA")) because they directly contravene the E.O. by ordering contracting officers to no longer *require* PLAs without first applying the E.O.'s exceptions for a particular project. Defendants' memoranda irreparably harm Plaintiffs not by banning the use of PLAs, but by adversely changing Plaintiffs' bargaining position.

An adverse change in bargaining position is a cognizable injury-in-fact for

---

[2]    DOD issued a revised memorandum on April 23, 2025 to "clarify" the original memorandum. Off. of the Under Sec'y of Def., DARS Tracking No. 2025-O0002, *Class Deviation — Waiver of Project Labor Agreement Requirements* 1 (Apr. 23, 2025), https://www.acq.osd.mil/dpap/policy/policyvault/USA000893-25-DPCAP.pdf (last visited May 2, 2025) (hereinafter "DOD Mem."). The effect of the revised memorandum is indistinguishable from the original: Despite the E.O., the revised memorandum directs contracting officers to "issue solicitations without PLA requirements and remove PLA requirements from any pending solicitations." *Id.* Unless otherwise apparent from the context, Plaintiffs' arguments apply equally to the original and the revised memoranda.

Article III standing purposes. In *Clinton v. City of New York*, 524 U.S. 417 (1998), the Supreme Court held that a farmers' cooperative had standing to challenge President Clinton's line-item veto cancellation of a tax benefit that Congress had established to assist farmers' cooperatives in acquiring processing facilities. The cooperative routinely used the tax benefit in obtaining more favorable purchase terms and "was engaged in ongoing negotiations with the owner of a processing plant who had expressed an interest in structuring a tax-deferred sale when the President canceled" the tax benefit. *Id.* at 432. The Court rejected the Government's argument that the cooperative's harm was too speculative, explaining that, "[b]y depriving [the cooperative] of their statutory bargaining chip, the cancellation inflicted a sufficient likelihood of economic injury to establish standing under our precedents." *Id.*

Similarly, in *AFGE v. FLRA*, 25 F.4th 1 (D.C. Cir. 2022) (Jackson, J.), the D.C. Circuit found that several federal sector unions had standing to challenge a change in policy implemented by the Federal Labor Relations Authority ("FLRA"). In that case, the unions sued the FLRA over a four-page policy statement in which the FLRA announced that it was changing its standard for determining when the duty to bargain is triggered. The D.C. Circuit explained that, "[t]he unions have standing as employee representatives whose 'bargaining position' would be 'fundamentally diminished' under the FLRA's new interpretation" of the governing statute. *Id.* at 4; *see also In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 213 (3d Cir. 2011) (en banc) (citing *Clinton*, "a tangible disadvantage to the affected party" resulting from defendant's challenged action "can lead to standing"); *NTEU v. Chertoff*, 452 F.3d 839, 854

(D.C. Cir. 2006) (finding that the "harm to [the unions'] bargaining position" inflicted by a DHS final rule "is certainly a real injury" for purposes of standing).

Defendants' memoranda deprive Plaintiffs of significant bargaining power. Because the E.O. requires contractors on large-scale construction projects to use PLAs, absent a showing that an exception applies for a particular project, building trades unions like NABTU and its affiliate councils enjoy significant leverage in bringing construction bidders to the bargaining table. By defying the E.O.'s PLA requirement, however, Defendants have significantly changed Plaintiffs' bargaining position, resulting in tangible irreparable harm.

Indeed, Plaintiffs have identified a construction bidder that ceased negotiating a PLA because the contracting officer removed the PLA requirements from a solicitation pursuant to the DOD memorandum. *See* Akerman Decl. ¶ 11; *see also Clinton*, 524 U.S. at 426-27, 432-33 (standing established because once the President used a line-item veto to eliminate a tax benefit to facilitate the acquisition of processing plants, negotiations over a farmers' cooperative's acquisition of such a plant terminated). Moreover, the harm to Plaintiffs' bargaining position will continue as long as the DOD and GSA memoranda remain in effect.

Defendants' attempt to recast Plaintiffs' injury as contractual in nature is equally unavailing. Defendants argue that, "to the extent Plaintiffs seek to challenge the bid processes . . . the Court of Federal Claims, not this Court, has exclusive jurisdiction." Defs.' Mem. 12. But Plaintiffs are not actual or prospective bidders or offerors, and their claims are not a bid protest or a challenge to the solicitation for any

8

DOD or GSA project.  Additionally, Plaintiffs' injury is not contract-specific; rather, Plaintiffs' bargaining positions have been negatively impacted across-the-board.

To determine if a claim is "at its essence" a contract claim — and therefore subject to the exclusive jurisdiction of the Court of Federal Claims — courts examine both "the source of the rights upon which the plaintiff bases its claims, and . . . the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).  Plaintiffs invoke their right under the APA to have DOD and GSA not act contrary to law or in an arbitrary and capricious manner.  Plaintiffs also do not seek relief that is contractual in nature because they do not seek monetary damages.  *See Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (whether a remedy sounds in contract "boils down to whether the plaintiff effectively seeks to attain monetary damages"); *see also AIDS Vaccine Advoc. Coal. v. Dep't of State*, ___ F. Supp. 3d ___, 2025 U.S. Dist. LEXIS 42875, at *29-30 (D.D.C. Mar. 10, 2025) (Plaintiffs' APA claims challenging agency policy directives were not contract claims because plaintiffs' challenge was to "whether the agency action . . . was unlawful, irrespective of any breach" of contract.).

In short, Plaintiffs allege quintessential APA claims (challenges to agency actions that are arbitrary and capricious and contrary to existing law) and seek a quintessential APA remedy (prospective injunctive relief).  This Court therefore has jurisdiction to hear Plaintiffs' claims because they are "validly based on grounds other than a contractual relationship with the government." *Crowley Gov't Servs., Inc.*, 38 F.4th at 1107 (quoting *Megapulse,* 672 F.2d at 968).

**B.      *Plaintiffs' Diminished Bargaining Power Is Caused by Defendants' Memoranda and Would Be Redressed by an Injunction.***

Defendants argue that the causal chain between their memoranda and Plaintiffs' change in bargaining position is "broken by the decision of [Plaintiffs'] negotiating partners whether to continue to negotiate PLAs with Plaintiffs in future solicitations." Defs.' Mem. 14. But that argument "wrongly equates injury 'fairly traceable' to the defendant[s] with injury as to which the defendant[s'] actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997).

Injuries flowing "from the natural and probable consequences" of agency actions establish causation. *Permapost Prods., Inc. v. McHugh*, 55 F. Supp. 3d 14, 23 (D.D.C. 2014). Accordingly, unions have standing to challenge agency actions that increase competition with union contractors, causing union members to lose work. *E.g.*, *ALPA v. Chao*, 889 F.3d 785, 788-89 (D.C. Cir. 2018) (grant of permit to nonunion air carrier threatened competition with union air carriers and, therefore, union members' jobs and wages, giving their union standing); *Int'l Bhd. of Teamsters v. DOT*, 724 F.3d 206, 212 (D.C. Cir. 2013) (same with respect to DOT pilot program allowing competition by non-U.S. trucks).

Here, the E.O. requires, with limited exceptions, that contractors performing large-scale government construction projects negotiate a PLA with labor organizations like Plaintiffs. But Defendants' memoranda direct agencies to remove the PLA requirements from their solicitations. The inevitable consequence of Defendants' actions is an adverse change to Plaintiffs' bargaining position. It does not matter that

10

"third-party contractors [may or may not] want to negotiate PLAs with [Plaintiffs] in future solicitations," Defs.' Mem. 15 — contractors are no longer required to do so *because of* Defendants' memoranda.  In fact, Plaintiffs have already lost bargaining opportunities, and the only cause for those lost opportunities is Defendants' memoranda.  *See, e.g.*, Pls.' Mem. in Support 11-12 (outlining the direct chain of causation from the original DOD memorandum, to the amended bid solicitation for the Marine Barracks project in Washington, D.C., to a contractor's decision to stop negotiating a PLA with the Baltimore-D.C. Building Trades).

Defendants bungle the redressability analysis, arguing that an injunction would not prevent DOD and GSA from issuing solicitations without a PLA requirement.  Defs.' Mem. 15-16.  But that's neither accurate nor relevant.  Plaintiffs bargained numerous PLAs on large-scale construction projects for Defendants before the memoranda, *see* McGarvey Decl. ¶¶ 10-13, even though DOD and GSA, under Defendants' logic, could have granted exceptions to the PLA requirement consistent with the E.O.  More importantly, the remedy Plaintiffs seek is not a PLA requirement without exceptions, but restoration of the bargaining chip that the E.O.'s PLA presumption gave Plaintiffs.

Solicitations are now being issued without PLA requirements and existing solicitations are being amended to remove PLA requirements *because of* Defendants' memoranda.  In fact, DOD's revised memorandum expressly requires the removal of PLA requirements from pending solicitations.  DOD Mem., *supra*, at 1.  All an injunction would do is require Defendants "to behave as if the memorand[a] were never

11

issued." *Nat'l Council of Nonprofits v. OMB*, ___ F. Supp. 3d ___, 2025 U.S. Dist. LEXIS 18824, at *18 (D.D.C. Feb. 3, 2025).  Pretending that DOD and GSA might except all projects from the PLA requirement even in the absence of their memoranda defies "both logic and fact."  *Id.*[3]

### III.    Plaintiffs Are Likely to Succeed on the Merits.

#### A.    *The DOD and GSA Memoranda Are Final Agency Actions Because They Mark the Agencies' Last Word on the Matter and Have Legal Consequences.*

Defendants argue that the memoranda are "intermediate or interlocutory actions" — not "final" agency actions — "because they direct government officials to take further action."  Defs.' Mem. 17.  Defendants also assert that the memoranda are not final agency actions because "[t]he Memos do not purport to regulate Plaintiffs or the actions of anyone outside of internal government actors."  Defs.' Mem. 18.  According to Defendants, "the solicitation itself," and not the memoranda, "is [the] final agency action."  Defs.' Mem. 18.

Again, Defendants miss the mark.  Despite the E.O.'s unambiguous command that PLAs be required on large-scale construction projects absent an exception for a particular project, Defendants' memoranda order contracting officers to stop requiring PLAs on large-scale construction projects and, in the case of the revised DOD memorandum, to "remove PLA requirements from any pending solicitations."  DOD

---

[3]    Defendants argue that "to the extent standing is dependent on an ongoing solicitation, Plaintiffs have failed to establish standing against the GSA."  Defs.' Mem. 12.  Plaintiffs' standing is dependent not on an ongoing solicitation, but on the ongoing enforcement of Defendants' memoranda, which injure Plaintiffs' bargaining position for all future DOD and GSA Land Port of Entry projects.

Mem., *supra*, at 1.  Thus, the memoranda constitute *final* agency action because they (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) constitute actions "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett*, 520 U.S. at 178 (internal citations omitted).

First, the DOD and GSA memoranda — by their terms and their practical effect — mark the consummation of the agencies' decision-making process with respect to requiring PLAs on large-scale construction projects because they mark the agencies' "last word on [the] matter."  *Mass. Coal. for Immigr. Reform v. DHS*, 621 F. Supp. 3d 84, 95 (D.D.C. 2022) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001)).  Defendants admit as much, stating that "the Memos themselves announce that the agencies intend not to require PLAs in future solicitations."  Defs.' Mem. 10.  The DOD memorandum clearly mandates that, "contracting officers ***shall*** issue solicitations without PLA requirements and ***remove*** PLA requirements from any pending solicitations."  DOD Mem., *supra*, at 1 (emphases added).  Likewise, under the GSA memorandum, PLAs will not be required on any future GSA Land Port of Entry contract because, according to GSA, "requiring a PLA would be impracticable."  McGarvey Decl. Ex. E, GSA Off. of Governmentwide Pol'y, SPE Memo SPE-2025-05, *Class Exception to Requiring a Project Labor Agreement for Land Ports of Entry* 1 (Feb. 12, 2025) (hereinafter "GSA Mem.").  Simply put, the memoranda convey DOD and GSA's "last word" in no uncertain terms:  PLAs are no longer required.  Full stop.

The fact that the memoranda direct contracting officers to take further action does not render them "intermediate" instead of "final" actions.  Where an agency

13

action binds agency personnel to take further action in a specific way, that action is "final" for the purposes of the APA. *See NRDC v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (finding that an EPA guidance letter that withdrew regional directors' discretion to consider alternative ozone standard compliance programs "binds EPA regional directors" and "thus qualifies as final agency action"); *Pub. Emps. for Env't Resp. v. NPS*, No. 19-cv-3629, 2021 U.S. Dist. LEXIS 60097, at \*24 (D.D.C. Mar. 30, 2021) (finding an NPS directive announcing that e-bikes are to be treated the same as traditional bikes was final agency action because it "required" park superintendents to "take [specific] actions as soon as possible").

Second, the DOD and GSA memoranda are actions by which rights or obligations have been determined and from which legal consequences will flow because they "alter the legal regime to which the agency action is subject." *Bennett*, 520 U.S. at 178. That is, the memoranda change the legal framework for DOD and GSA contracting officers by eliminating the E.O.'s PLA presumption. *See also Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 29 (D.C. Cir. 2006) ("Where agency guidance alters the obligations of either [an agency or a petitioner or both], we found final agency action."). The memoranda also have legal consequences — construction bidders are no longer legally required to agree to PLAs with labor organizations like Plaintiffs in order to bid on any DOD large-scale construction project and any GSA large-scale Land Port of Entry construction project.

Defendants erroneously rely on the Ninth Circuit's decision in *Southern California Alliance of Publicly Owned Treatment Works v. EPA*, 8 F.4th 831 (9th Cir.

14

2021) ("*SCAPOTW*"), Defs.' Mem. 18-19, which involved nonbinding EPA guidance that recommended using a certain statistical method for assessing water toxicity. The Ninth Circuit found the EPA's nonbinding recommendation was not a final agency action because it "create[d] no concrete consequences on its own." 8 F.4th at 837. The DOD and GSA memoranda, however, use mandatory language that is binding on contracting officers. Indeed, DOD's own contracting officers have interpreted the memorandum as binding and — even before it was revised — have amended solicitations to remove PLA requirements. *See* Pls.' Mem. in Support 10-12. *Compare, e.g., Pub. Emps. for Env't Resp.*, 2021 U.S. Dist. LEXIS 60097, at \*23-26 (NPS directive's use of "mandatory – not tentative – language" "created direct and appreciable legal consequences for NPS park patrons" and therefore constituted final agency action.), *with Del. Valley Reg'l Ctr., LLC v. DHS*, 106 F.4th 1195, 1204 (D.C. Cir. 2024) ("An agency action [that] does not impose binding duties . . . causes no 'legal consequences.'").

Finally, that "[c]onstruction bidders are still free to enter PLAs," Defs.' Mem. 10, does not change the fact that the memoranda are final agency actions. "[A]n agency's action need not flatly prohibit a party from acting in order to affect its legal rights; it is enough that the agency action presently and directly limits or defeats a party's ability to enter into an advantageous business arrangement." *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1253 (D.C. Cir. 2021) (concluding that an FAA action was "final" because it "effectively foreclose[d] Spirit from" undertaking activities as "it would otherwise" and "hinder[ed] Spirit's ability to pursue business opportunities").

15

Even though construction bidders are not prohibited from entering PLAs, DOD and GSA's memoranda are final agency actions because those contractors are no longer *required* to do so, absent an exception granted on a *case-by-case* basis, and that change alters the Plaintiffs' ability to induce construction bidders to negotiate PLAs on DOD projects and GSA Land Port of Entry projects.

**B.    *Defendants' Memoranda Are Contrary to Law.***

As explained above and in Plaintiffs' Memorandum in Support, at 17-20, Defendants' memoranda plainly contradict the requirements of the E.O. and, therefore, are contrary to law.  Defendants maintain that their memoranda are not contrary to law because they "contemplate that future solicitations will exercise exceptions or deviations on individual solicitations" and are otherwise valid class exceptions/deviations.  Defs.' Mem. 19.  In other words, Defendants argue that they are simply following the E.O.'s process for granting exceptions to the PLA requirement.  But as discussed earlier, the E.O. by its terms precludes class deviations and exceptions. The E.O. establishes a PLA *presumption* that can only be overcome if a "senior official within an agency . . . for a particular contract by, no later than the solicitation date, provid[es] a specific written explanation of why [an exception applies] with respect to that contract."  McGarvey Decl. Ex. A, 87 Fed. Reg. at 7,364.

Defendants' claim that the E.O.'s "particular contract" language does not preclude "determination[s] for multiple contracts at once" is nonsensical.  Defs.' Mem. 20-21.  Exceptions to the E.O.'s PLA presumption must be determined on a case-by-case basis.  *See* Pls.' Mem. in Support 4.  Indeed, in the preamble to the final rule implementing the E.O., the FAR Council addressed one commenter's concern that

16

"senior procurement executives will simply check a box to avoid a PLA." McGarvey Decl. Ex. C, 88 Fed. Reg. at 88,719. According to the FAR Council, "[e]xceptions will *only* be authorized in accordance with the direction in section 5 of the executive order," which provides for "a *case-by-case* analysis to determine whether an exception to the general PLA requirement is authorized." *Id.* at 88,717, 88,719. Granting a class exception or class deviation from the PLA requirement is incompatible with the case-by-case exception process set forth in the E.O. and the FAR Council's implementing regulations.

Not only do the E.O. and implementing regulations require exceptions to be made only on a case-by-case basis, but they also establish a temporal limitation for any such exception. Section 5 of the E.O. provides that, "[a] senior official within an agency may grant an exception from the requirements of section 3 of this order for a particular contract . . . no later than the solicitation date." McGarvey Decl. Ex. A, 87 Fed. Reg. at 7364. FAR 22.504(d)(3) states unequivocally that, "[t]he exception must be granted for a particular contract by the solicitation date." 48 CFR § 22.504(d)(3). Yet, the initial and revised DOD memoranda mandate that contracting officers "shall amend solicitations to remove [PLA] requirements," McGarvey Decl. Ex. D, Off. of the Under Sec'y of Def., DARS Tracking No. 2025-O0002, *Class Deviation — Waiver of Project Labor Agreement Requirements* (Feb. 7, 2025) (initial), and "shall remove PLA requirements from any pending solicitations," DOD Mem., *supra*, at 1 (revised). Accordingly, contracting officers have amended solicitations well after the solicitation date to remove PLA requirements. McGarvey Decl. Ex. G; Akerman Decl. Ex. B.

17

Defendants claim that agencies can "issu[e] deviations that are inconsistent with the underlying regulation, as deviations are, by definition, inconsistent with the regulation they seek to deviate from." Defs.' Memo. 20. It is certainly true that deviations are, by definition, inconsistent with regulations, but FAR 1.402, 48 C.F.R. § 1.402, specifically provides that deviations may be granted "[u]nless precluded by law, executive order, or regulation." In other words, senior agency officials may not approve deviations that a law, executive order, or regulation rules out. Here, because the E.O. requires a presumption in favor of PLAs, it is beyond the power of DOD and GSA to deviate from that requirement. The E.O. rules out class deviations from the PLA presumption by only allowing exceptions to be granted on a case-by-case basis, and only prior to the solicitation date.

Even if Defendants' memoranda are read as attempts to except specific projects on a class-wide basis from the PLA presumption, the justifications provided are inconsistent with the E.O.'s specifically delineated exceptions. DOD purportedly decided to exclude projects from the PLA presumption because, as a result of the Court of Federal Claims' decision in *MVL USA, Inc. v. United States*, 174 Fed. Cl. 437 (2025), "[m]ore than 20 other projects . . . are already experiencing delays due to the PLA requirements and will be at risk of protest if the PLA requirement were to remain in effect." Kurland Decl. Ex., at 1-2; *see also* DOD Mem., *supra*, at 1 (arguing that the "class deviation is needed to ensure contracting officers are able to award contracts for Federal large-scale construction projects in accordance with [the Court of Federal Claims'] *MVL* decision"). GSA argues, without evidentiary support, that

18

"including a PLA requirement for projects in remote rural locations, without strong existing union presence, causes delays," which "increase risk of bid protests" like the protest underlying *MVL*. GSA Mem., *supra*, at 2. Moreover, GSA determined that there would be "a high probability for substantial reduction in the number of potential offers and a substantial increase in price for future projects along the Northern and Southern borders due to the very limited labor pool and even lower unionization rates in these geographic areas." *Id.*

Defendants do not argue that their projects are short or lacking in complexity. They do not claim that their projects will involve only one craft or trade. And their projects do not involve work that is so specialized that only a few contractors or sub-contractors are able to perform it.

Defendants claim that a risk of delays and bid protests after the *MVL* decision satisfies the urgency exception. As OMB has explained, the need to rapidly respond to natural disasters, pandemics, or national security needs can be sufficiently urgent, such that mandating use of a PLA could be impracticable. McGarvey Decl. Ex. B, at 7. But "most large-scale construction projects involve long-lead times and extensive advance planning." *Id.* Defendants have not shown how the need for their projects is *unusually* and compellingly urgent. What, for example, is so urgent about the construction of new enlisted servicemember quarters in Washington, D.C., *see* Akerman Decl. ¶ 8, or a dairy industry research center in Wisconsin, *see* McGarvey Decl. ¶ 16, that would make a PLA requirement impractical? The GSA memorandum cites the "current administration priority . . . to remedy the emergency on the United States

19

borders."  GSA Mem., *supra*, at 1-2.  But GSA does not explain why modernizing international bridges, updating federal buildings, or other Land Port of Entry projects are abnormally urgent compared to other GSA projects.  *Id.* at 2.

With respect to the second exception, GSA argues that the PLA requirement will reduce the number of potential bidders.  GSA cites "market research" showing that despite receiving an average of three to four responses to requests for information on Land Port of Entry procurements, GSA received fewer actual offers.  Moreover, in a past procurement, GSA found "a lack of interest . . . directly related to the inclusion of the PLA requirement with an already limited pool of unionized labor available for construction projects in remote areas."  GSA Mem., *supra*, at 2.  In that case, the only viable offer was "considerably higher than the GSA estimate and required extensive negotiations (and therefore delays) with the offeror."  *Id.* at 2-3.

But as FAR 22.504(d)(1)(ii) explains:  "A likely reduction in the number of potential offerors is not, by itself, sufficient to except a contract from coverage under this authority unless it is coupled with the finding that the reduction would not allow for adequate competition at a fair and reasonable price," based on that market research.  OMB guidance shows that the market research "must be contemporaneous on a project-specific basis."  McGarvey Decl. Ex. B, at 3.  Additionally, "agencies must make sure that their market research is conducted in a manner that seeks to identify *both* union and non-unionized contractors," *id.* at 4, since the E.O. requires that PLAs allow participation by all contractors "without regard to whether they are otherwise parties to collective bargaining agreements," McGarvey Decl. Ex. A, 87 Fed. Reg. at

20

7,364.  GSA has not shown that its market research considered union and nonunion contractors — instead, GSA seems to incorrectly assume that PLAs require "unionized labor" only.  Plus, GSA's *past* market research would by definition not be contemporaneous to *future* solicitations.  GSA has thus not shown that the E.O.'s second exception applies to all future Land Port of Entry projects.

Finally, Defendants wrongly continue to rely on the Court of Federal Claims' decision in *MVL*.  *See* Kurland Decl. Ex., at 1-2; DOD Mem., *supra*, at 1; GSA Mem., *supra*, at 2.  Though *MVL* was limited to discrete bid protests, Defendants now argue that the reasoning in *MVL* would likely affect future solicitations.  Defs.' Mem. 22.  However, "convenient litigating position[s]," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988), or "*post hoc* rationalization[s]" in response to litigation, *Auer v. Robbins*, 519 U.S. 452, 462 (1997), do not survive arbitrary-or-capricious review.  As the Ninth Circuit explained in *City of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), the risk of future litigation following an unfavorable court decision does not allow agencies to take positions at odds with the plain language of a binding E.O. *See* Pls.' Mem. in Support 20.

Beyond being inconsistent with the Department of Justice's position in *MVL* itself, *see* Pls.' Mem. in Support 19-20, Defendants' position is also at odds with the Trump Administration's application of *MVL* in a bid protest decision last month.  *See* *4K Global-ACC JV, LLC*, B-423092.2 (Comp. Gen. Apr. 11, 2025).[4]  In *4K Global*, a

---

[4]    https://www.gao.gov/assets/880/876975.pdf (last visited May 2, 2025).

disappointed bidder argued that *MVL* prohibited DOD from requiring a PLA in other solicitations.  The Comptroller General rejected that argument, stating that, "nothing in the court's decision indicate[d] that its interpretation would apply to the award" at issue in the separate bid protest.  *Id.* at 4.  "Specifically, the *MVL* court limited its holding to 'the functionality of the mandate *as applied to the individual contracts in this case*' and the 'FAR requirements [for PLAs] in the solicitations . . . *as applied to the contracts at issue here*.'"  *Id.* (quoting *MVL*, 174 Fed. Cl. at 441, 463) (alterations in original) (emphases added).  Defendants cannot rely on *MVL* here because that decision has no bearing on unrelated solicitations.[5]

### C.    *DOD's Memorandum Is Arbitrary and Capricious.*

Defendants argue that the DOD memorandum is not arbitrary and capricious because DOD explained in "a contemporaneous memorandum" that a class deviation is urgently needed based on the Court of Federal Claims' decision in *MVL* and "market research."  Defs.' Mem. 21.  Putting aside the reasoning based on *MVL*, which has no bearing on solicitations beyond the few involved in that case, the only "market research" laid out in the contemporaneous memorandum is DOD's assumption that projects currently out for solicitation "are already experiencing delays due to the PLA requirements and will be at risk of protest if the PLA requirement were to remain in

---

[5]    Defendants claim that "the [E.O.] is not judicially enforceable against DoD." Defs.' Mem. 21 n.3.  Not so.  The E.O. provides a meaningful standard of review because it "has a distinct statutory foundation" (the Federal Property and Administrative Services Act) and is therefore "to be accorded the force and effect of" law.  *Ass'n for Women in Sci. v. Califano*, 566 F.2d 339, 344 (D.C. Cir. 1977).

effect." Kurland Decl. Ex., at 1-2.

To satisfy the arbitrary and capricious standard, "[t]he agency must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). Assuming for the sake of argument that substantial evidence shows that PLA requirements are causing delays, DOD has still "entirely failed to consider an important aspect of the problem": why it could not follow the E.O.'s process for granting exceptions on a project-by-project basis. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). DOD's "contemporaneous memorandum" was intended to explain why "urgent and compelling reasons exist to issue a class deviation *without affording the public an opportunity to comment*" under 41 U.S.C. § 1707(d), but it fails to explain why a class deviation (let alone an exception under the E.O.) is necessary. Kurland Decl. Ex., at 1 (emphasis added). Because DOD merely presumed that a "class deviation is urgently needed," without explaining why it chose not to use the E.O.'s exception process, its decision was arbitrary and capricious. *See, e.g.*, *ILGWU v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983) (An agency's failure to "provide any explanation for [its] implicit rejection of alternatives . . . and to explain why such alternatives were not chosen, was arbitrary and capricious.") (footnote omitted).

## IV. Defendants Do Not Dispute that Diminished Bargaining Power Is Irreparable Harm.

In response to Plaintiffs' arguments that their lost opportunities to negotiate PLAs amount to irreparable harm, Defendants refer to their off-base standing arguments. *See* Defs.' Mem. 23-24. Plaintiffs have countered those arguments above.

23

Otherwise, Defendants do not dispute that diminished bargaining power satisfies the irreparable harm standard.

## V.    Defendants Pervert the Plain Language of Plaintiffs' Proposed Order to Skew the Balance of Equities.

Defendants claim that "[i]t is unclear whether Plaintiffs are asking the Court to require DoD and GSA to require PLAs." Defs.' Mem. 25. Defendants assert that granting the injunction would "hamstring DoD and GSA procurement officers into requiring PLAs in future actions, regardless of whether an exception is warranted." *Id.* at 24. Defendants also contend that, "[t]o the extent Plaintiffs merely ask the Court to order the agencies to continue to implement the PLA EO and its require-ments, including the ability to exempt individual solicitations, this too is an imper-missible 'obey the law' injunction." *Id.* at 25.

To be clear, Plaintiffs are not asking for a generalized injunction that Defend-ants "obey" the E.O. or require PLAs. All Plaintiffs are asking is that the Court enjoin Defendants "from taking any action whatsoever to implement or enforce" their mem-oranda, which unlawfully override the requirements of the E.O. ECF No. 5-13, at 2. Under the E.O., DOD and GSA are still free to consider and grant exceptions on a case-by-case basis. *See United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (per curiam) (distinguishing between "a generalized injunction to obey the law" and an injunction that "sufficiently specif[ies] the activities enjoined as to provide Defendants with fair notice of the prohibited conduct").

## VI.    This Court Should Not Require Plaintiffs to Post Security.

The Court should deny Defendants' request to "require Plaintiffs to post an

24

appropriate bond commensurate with the scope of any injunction." Defs.' Mem. 26. This Court has broad discretion in deciding whether to require security under Federal Rule of Civil Procedure 65(c), and it may decline to require security if the Defendants fail to prove that the preliminary injunction will cause them any harm. *Am. First Legal Found. v. Becerra*, No. 24-cv-1092, 2024 U.S. Dist. LEXIS 141534, at \*51 n.11 (D.D.C. Aug. 9, 2024). Defendants provide no proof that they will be harmed by the requested preliminary injunction. Therefore, no bond (or at most only a "nominal" bond, *NRDC v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971)) should be required.

Finally, Defendants also request that any preliminary injunction be stayed for seven days. Defs.' Mem. 26. But there is no reason for this Court to stay an order granting a preliminary injunction, which will merely restore the status quo by requiring Defendants to stop enforcing their unlawful memoranda.

## CONCLUSION

This Court should grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

/s/ Jonathan D. Newman
Jonathan D. Newman (D.C. Bar No. 449141)
Lucas R. Aubrey (D.C. Bar No. 982849)
Jacob J. Demree (D.C. Bar No. 90012042)
Erich H. Lange (D.C. Bar No. 90019794)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
aubrey@shermandunn.com
demree@shermandunn.com
May 2, 2025                    lange@shermandunn.com

25

## CERTIFICATE OF SERVICE

I certify that on May 2, 2025, this memorandum was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Jonathan D. Newman
Jonathan D. Newman (D.C. Bar No. 449141)
Lucas R. Aubrey (D.C. Bar No. 982849)
Jacob J. Demree (D.C. Bar No. 90012042)
Erich H. Lange (D.C. Bar No. 90019794)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
aubrey@shermandunn.com
demree@shermandunn.com
lange@shermandunn.com

May 2, 2025