# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

NORTH AMERICA'S BUILDING TRADES : 
UNIONS, *et al.*, :
     :
     Plaintiffs, :    Civil Action No.:    25-1070 (RC)
     :
     v. :    Re Document No.:    5
     :
DEPARTMENT OF DEFENSE, *et al.*, :
     :
     Defendants. :

## MEMORANDUM OPINION

### GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

North America's Building Trades Unions ("NABTU") and Baltimore-D.C. Metro Building and Construction Trades Council ("Baltimore-DC Building Trades") (collectively, "Plaintiffs") seek a preliminary injunction against the Department of Defense ("DoD"); Peter B. Hegseth, in his official capacity as Secretary of Defense; the General Services Administration ("GSA"); and Stephen Ehikian, in his official capacity as Acting Administrator of GSA (collectively, "Defendants"). Plaintiffs challenge recent memoranda issued by the DoD and GSA that exempt certain large-scale construction projects from the Project Labor Agreement ("PLA")[1] requirements set forth by Executive Order 14,063 (the "EO"). Plaintiffs argue that

---

[1] PLAs are pre-hire agreements between project owners (such as government entities or private contractors) and labor unions that set the terms and conditions of employment for a specific construction project. *See generally* Exec. Order No. 14,063, 87 Fed. Reg. 7363, 7363 (Feb. 4, 2022) (the "EO"). In the context of the EO, which was issued by President Joseph R. Biden in 2022, these agreements are used to establish rules on wages, working hours, dispute resolution, benefits, and other workplace policies before construction begins, with the aim of ensuring labor harmony, promoting efficiency, and minimizing project delays. *See id.* The EO encourages the use of PLAs for large-scale, federal infrastructure projects that meet certain cost

these actions unlawfully revoke the PLA mandate and harm their ability to negotiate and administer PLAs, particularly affecting major projects like the Marine Barracks in Washington, D.C. and the United States Department of Agriculture ("USDA") Dairy Forage Research Center in Wisconsin. The DoD and GSA contend that, although PLAs will not be mandated for large-scale construction projects, projects that contain PLAs will still be considered, but Plaintiffs assert that the memoranda undermine their role in the process and deprive them of the "bargaining chip" the EO PLA mandate provides them. As a result, Plaintiffs seek a preliminary injunction to prevent further harm and ensure compliance with the EO. For the foregoing reasons, the Court grants Plaintiffs' motion for preliminary injunction.

## II. REGULATORY BACKGROUND

On February 4, 2022, President Biden issued Executive Order 14,063, which articulates that "in awarding any contract in connection with a large-scale construction project, or obligating funds pursuant to such a contract, agencies shall require every contractor or subcontractor engaged in construction on the project to agree, for that project, to negotiate or become a party to a project labor agreement with one or more appropriate labor organizations." Exec. Order No. 14,063, 87 Fed. Reg. 7363, 7364 (Feb. 4, 2022) (the "EO"); *see also* Compl. ¶¶ 21–25, ECF No. 1.[2] The requirement pertains to federal construction projects with an anticipated cost to the

---

thresholds (typically $35 million or more). *Id.* The EO aims to reduce the risk of strikes, lockouts, and disputes, and increase project efficiency. *Id.*

[2] President Biden is not the first Chief Executive to address the use of PLAs in federal procurement through executive action. Although a comprehensive review of the more than thirty-year history of executive orders on this subject is unnecessary for purposes of this Opinion, it is sufficient to observe that, beginning with President George H.W. Bush in 1992, nearly every succeeding President has issued an executive order either prohibiting, encouraging, or adopting a neutral stance toward the use of PLAs in federal contracting. *See MVL USA, Inc. v. United States*, 174 Fed. Cl. 437, 443–45 (Fed. Cl. 2025). During his first term, President Trump did not revoke the executive order issued by President Obama, which encouraged federal agencies to consider the use of PLAs, though it stopped short of mandating their adoption. *Id.* at

federal government of $35 million or greater.  Exec. Order No. 14,063, 87 Fed. Reg. at 7363.

However, "[a] senior official within an agency may grant an exception from the requirements . . .

for a particular contract" under circumstances specified in section 5 of the EO.  *Id.* at 7364.  On

December 18, 2023, the Office of Management and Budget ("OMB") issued a memorandum—

without prior public notice or opportunity for comment—offering guidance to federal agencies

on the exceptions to the PLA Rule and related reporting requirements.  Compl. ¶ 29.  On

December 22, 2023, after considering public comments, the Federal Acquisition Regulatory

("FAR") Council issued a final rule implementing the requirements of the Executive Order

(referred to as the "PLA Rule"), effective on January 22, 2024.  *Id.* ¶ 27.  The EO and the PLA

Rule mandate that agencies publicly disclose any granted exemptions by posting them on a

designated public website.  Exec. Order No. 14,063, 87 Fed. Reg. at 7364–65.

## III.  FACTUAL AND PROCEDURAL BACKGROUND

NABTU represents over three million workers through 14 national and international

unions and over 330 trade councils.  Decl. of Sean McGarvey ("McGarvey Decl.") ¶ 3, ECF No.

5-2.  NABTU, including its affiliate, the Baltimore-D.C. Building Trades, plays a key role in

negotiating and administering PLAs for federal construction projects, including those subject to

the EO.  *See* Mem. in Supp. of Pls.' Mot. for Prelim. Inj. ("Pls.' Mot.") at 1, ECF No. 5-1.

---

445.  That executive order, however, was more limited in scope than the one presently under
review.  At the time of this Opinion, President Trump had not rescinded the EO at issue.  On
March 14, 2025, he issued Executive Order 14,236, which formally repealed Executive Order
14,126—a directive that had promoted the use of PLAs in federal construction projects.  *See*
Exec. Order No. 14,236, 90 Fed. Reg. 13037 (Mar. 14, 2025).  While this development calls into
question the continued enforceability of EO No. 14,063, this Court has not been advised that the
Executive Branch has expressly abandoned the EO or the associated regulations and guidance,
nor have the parties represented that this action has been rendered moot.  Accordingly, in the
absence of definitive action by the Executive Branch or a concession from the parties, the Court
will proceed to adjudicate the merits of Plaintiffs' motion for a preliminary injunction.

NABTU and its affiliates enter into hundreds of PLAs each year, including agreements for various large-scale projects funded by federal agencies like the DoD and GSA.  *See* McGarvey Decl. ¶¶ 9–11.  Examples include PLAs for projects such as the $137 million Indian River Lagoon-South project in Florida, *see id.* ¶ 11, and a $238 million training complex at Lackland Air Force Base in Texas, *see id.* ¶ 12.

On February 7, 2025, DoD issued a memorandum stating that contracting officers should no longer require agreements to negotiate PLAs for large-scale projects, instructing them to amend solicitations accordingly.  Mem. re: Class Deviation—Waiver of Project Labor Agreement Requirements, Dep't of Defense ("DoD Mem."), ECF No. 5-6.  Similarly, on February 12, 2025, GSA issued its own memorandum, exempting Land Port of Entry ("LPOE") projects from the PLA requirement, citing specific conditions in these projects, such as their locations and anticipated timelines, as grounds for the exception.  Mem. for All PBS Contracting Activities and Heads of Contracting Activity, GSA ("GSA Mem."), ECF No. 5-7.  The memoranda "announce that the agencies intend not to require PLAs in future solicitations."  *See* Defs.' Mem. Opp'n Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n") at 10, ECF No. 14.

Plaintiffs argue that these memoranda unlawfully revoke the PLA requirement set forth in Executive Order 14,063 and its implementing regulations, thereby harming NABTU's ability to negotiate and administer PLAs.  *See generally* Compl.  As a result of the memoranda, existing solicitations for projects such as the USDA Dairy Forage Research Center in Wisconsin and the Marine Barracks project in D.C. were amended to exclude the PLA requirement that was included in the original solicitation.  McGarvey Decl. ¶ 16; Decl. of Greg Akerman ("Akerman Decl.") ¶ 10, ECF No. 5-10.  In particular, the Baltimore-DC Building Trades allegedly experienced direct harm when the DoD amended the solicitation for the Marine Barracks project,

removing the PLA requirement and halting ongoing negotiations the union was engaged in with a contractor expected to bid for that project.  Akerman Decl. ¶¶ 9–11.

Executive Order 14,063 mandates that federal agencies, including the DoD and GSA, include the PLA mandate on their solicitations for large-scale construction projects, unless a specific exception is found on a case-by-case basis.  *See* 87 Fed. Reg. at 7364.  Plaintiffs allege that DoD and GSA have deviated from this requirement by issuing memoranda that override the PLA mandate, actions which Plaintiffs challenge as unlawful under the Administrative Procedure Act ("APA").  *See generally* Compl.

On April 9, 2025, Plaintiffs filed this action against Defendants over the memoranda they issued regarding PLAs.  Plaintiffs are a labor organization composed of national and international unions, along with a local labor council representing construction trades unions in Maryland, D.C., and Northern Virginia.  *See* Compl. ¶¶ 9–10.  Plaintiffs allege injury based on the agencies' decisions not to include the PLA requirement in future solicitations, which exclusion they claim interferes with Plaintiffs' ongoing practice of negotiating such agreements with contractors bidding on federal large-scale construction projects.  *See id.* ¶ 38.  Plaintiffs argue that these actions by DoD and GSA have excluded entire classes of construction projects from the scope of the EO's PLA mandate, which NABTU and its affiliates would otherwise have been involved in negotiating for such projects.  McGarvey Decl. ¶ 16.  The Complaint brings three claims under the Administrative Procedure Act, 5 U.S.C. § 706.  Counts I and II allege that the DoD and GSA memoranda constitute final agency actions "not in accordance with law" under § 706(2)(A), because the memoranda violated the EO and its implementing regulations.  *See* Compl. ¶¶ 57–64 (DoD); *id.* ¶¶ 65–70 (GSA).  Count III asserts that DoD's memorandum also violates the APA because it is arbitrary and capricious due to insufficient explanation.  *See*

*id.* ¶¶ 71–76.  Plaintiffs seek a declaration that the memoranda are unlawful and an injunction barring their enforcement.  *See id.* ¶¶ A–B.

On April 10, 2025, Plaintiffs filed a motion for a preliminary injunction to prevent enforcement of the agencies' memoranda while the case proceeds.  *See generally* Pls.' Mot. Defendants argue that both DoD and GSA's memoranda continue to allow bids for major construction projects that contain PLAs; the memoranda merely remove the mandatory requirement to negotiate their inclusion in the solicitations for such projects.  *See* Defs.' Opp'n at 2.  To which Plaintiffs replied that the agencies' actions unlawfully hinder their ability to negotiate PLAs by eliminating the "bargaining chip" that the PLA mandate provides them, and thus, they seek a preliminary injunction to prevent further harm.  Reply Mem. in Supp. Pls.' Mot. Prelim. Inj. ("Pls.' Reply") at 4, ECF No. 16.  The motion is fully briefed and ripe for resolution.

## IV.  LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'"  *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (alteration in original) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  When "the Government is the opposing party," the determination of the third and fourth factors regarding "harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C.

2020), and must do so by making a "clear showing," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

"The standard for irreparable harm is particularly high in the D.C. Circuit.  Plaintiffs have the considerable burden of proving that their purported injuries are certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm." *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (internal quotation marks omitted).  "In addition, the certain and immediate harm that a movant alleges must also be truly irreparable in the sense that it is beyond remediation." *Id.* (internal quotation marks omitted).  Plaintiffs must "substantiate" their claim of irreparable harm with "proof." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

In general, "[a] preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits," although an evidentiary hearing is required where there are "genuine issues of material fact" precluding a decision on the filings. *Cobell*, 391 F.3d at 261; *cf. Shvartser v. Lekser*, 330 F. Supp. 3d 356, 361 (D.D.C. 2018) (deciding hearing was unnecessary where defendants did not request hearing or raise any "genuine issues of material fact").  Here, neither party requests an evidentiary hearing. *See* Defs.' Consent Mot. for Extension of Time to Respond to Pls.' Mot. for Prelim. Inj. ¶ 3, ECF No. 7 ("At this stage, neither party requests oral argument.").  Accordingly, the Court will consider Plaintiffs' motion only on the parties' written submissions.  That said, because preliminary injunctions are a significant measure, "any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown" by the facts. *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 284 (D.D.C. 2018) (quoting *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001)).

### V.  ANALYSIS

Plaintiffs seek a declaration that the memoranda are unlawful, an injunction to prevent their enforcement, and an order granting Plaintiffs costs.  Compl. ¶¶ A–C.  Plaintiffs contend that they are likely to succeed on the merits of each of their three claims under the APA, 5 U.S.C. § 706.  *See* Pls.' Mot. at 15–21.  Defendants disagree, arguing that Plaintiffs have failed to make any of the required showings sufficient to warrant the extraordinary relief requested.  *See* Defs.' Opp'n at 8–25.

### A.  Standing

Before considering the merits of Plaintiffs' APA arguments, the Court must first determine whether Plaintiffs maintain standing to bring these claims.  It is an "essential and unchanging part of the case-or-controversy requirement" that a plaintiff must establish Article III standing to sue in federal court.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish Article III standing, a party must show that: (1) they have suffered an injury in fact, (2) the injury is fairly traceable to the challenged action of the defendant, and (3) it is likely that the injury will be redressed by a favorable decision.  *Id.* at 560–61.  A party seeking a preliminary injunction "must show a substantial likelihood of standing."  *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

Plaintiffs argue that they have standing because they suffered concrete and particularized injuries directly caused by Defendants' memoranda, which they claim eliminated or changed the "bargaining chip" the EO provided them by requiring the negotiation of PLAs on solicitations for large-scale federal construction projects.  Pls.' Mot. at 12–15; Pls.' Reply at 7.  These memoranda, they argue, exclude Plaintiffs from the contracting process and allegedly led to the

loss of specific PLAs they were in the process of negotiating or would have negotiated in the future. Pls.' Mot. at 12–15; Pls.' Reply at 7. Plaintiffs cite cases holding that losing bargaining opportunities or a change of bargaining position can constitute a valid legal injury for purposes of standing. Pls.' Mot. at 13–15; Pls.' Reply at 7. Plaintiffs further contend that a court ruling requiring adherence to Executive Order 14,063 would redress these harms. Pls.' Mot. at 15.

In response, Defendants argue that Plaintiffs lack Article III standing because they fail to demonstrate a concrete injury. Defs.' Opp'n at 9–13. Defendants assert that Plaintiffs' claimed injury is speculative, because the memoranda merely direct government agencies to remove the PLA requirement from future solicitations, without precluding contractors from submitting bids that voluntarily contain them. *Id.* Defendants further argue that the alleged injury (contracts for large-scale federal contracts that do not contain PLAs) is not directly caused by the memoranda but by third-party contractors who decide not to include PLAs in their bids for large-scale contracts. *Id.* at 14–15. Lastly, Defendants contend that even if the memoranda are enjoined, the alleged harm would not be redressed, as the government retains the authority to issue solicitations without a PLA requirement in the future. *Id.* at 15–16. For the reasons set forth below, the Court concludes that Plaintiffs have sufficiently demonstrated standing, as they have alleged concrete and particularized injuries traceable to Defendants' memoranda—namely, the loss of specific bargaining opportunities—and have shown that these injuries would likely be redressed by a decision reinstating the PLA requirements under the EO.

### 1. Injury in Fact

As set forth above, to establish that a plaintiff possesses standing to bring a claim, the plaintiff must show that he has suffered an injury in fact. *Lujan*, 504 U.S. at 560. To establish that he has suffered an injury in fact, a plaintiff must have suffered "an invasion of a legally

protected interest," *id.*, that is "(1) concrete, (2) particularized, and (3) actual or imminent." *Food & Water Watch*, 808 F.3d at 914 (quoting *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007)).  The injury in fact test "requires that the party seeking review be himself among the injured."  *Lujan*, 504 U.S. at 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)).

Plaintiffs argue that they have each suffered a concrete, particularized, and actual injury due to Defendants' memoranda, which deprive them of the "bargaining chip" the EO PLA requirement provided them in the contracting process for large-scale construction projects.  Pls.' Mot. at 15–17.  As a result, Plaintiffs claim they have lost the opportunity to negotiate PLAs— both currently and in the future—with contractors, as well as leverage when contractors do negotiate over PLAs, thereby weakening their bargaining position.  Plaintiffs further argue that this harm is not speculative: the memoranda have directly diminished their leverage in negotiations.  While Defendants contend that the memoranda merely express an intent not to require PLAs, rather than barring them, *see* Defs.' Opp'n at 10, Plaintiffs respond that removing the PLA requirement from solicitations has deprived them of meaningful bargaining power, *see* Pls.' Mot. at 15–16; Pls.' Reply at 6–8.  Plaintiffs have the better argument.

Plaintiffs have sufficiently demonstrated an injury in fact: a concrete, particularized, and actual harm resulting from the memoranda's discouragement of PLAs.  This harm is not conjectural or hypothetical; it is sufficiently demonstrated in the explicit removal of PLA requirements in amended solicitations, including for the Marine Barracks project, which abruptly ended ongoing PLA negotiations.  This satisfies the standard in *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 828–29 (D.C. Cir. 2006), and *Food & Water Watch*, 808 F.3d at 914, requiring an injury to be "real" and "immediate," not speculative.  The

facts point to the fact that NABTU and its affiliates had a direct role in negotiating PLAs for federal large-scale construction projects for which the solicitations were amended post the memoranda, demonstrating a tangible change in their operating environment.

As in *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 172 F. Supp. 2d 138 (D.D.C. 2001), the loss of bargaining opportunities tied to PLAs constitutes a concrete and justiciable injury.[3]  In *Allbaugh*, the district court recognized that the removal of a government policy encouraging PLAs was sufficient to constitute an injury in fact, as it impacted the unions' ability to effectively advocate for labor protections through PLAs.  172 F. Supp. 2d at 147–148 (holding that the loss of the plaintiff's ability to negotiate similar agreements in federal construction projects was "a change in bargaining position" that was "itself a particularized and concrete harm").  Here, the challenged memoranda operate similarly: by broadly exempting projects from PLA mandates without applying the EO's case-by-case exceptions, the memoranda deprive Plaintiffs of the structured leverage the EO is designed to ensure.

Similarly, in *Clinton v. City of New York*, 524 U.S. 417, 432–33 (1998), the Supreme Court found that loss of a statutory benefit that diminished bargaining strength was a cognizable injury, reinforcing Plaintiffs' claim.  Just as the loss of the tax deferral in *Clinton* nullified a negotiation position and terminated pending transactions, *see id.* at 426–27, 432, the removal of the PLA mandate here also undercuts NABTU's leverage and has already disrupted actual negotiations, Pls.' Mot. at 12–13.  The Court in *Clinton* emphasized that economic leverage lost due to governmental action—even where no direct prohibition existed—was sufficient for

---

[3] Although the D.C. Circuit reversed this decision, the reversal did not disturb the standing conclusion.  *See Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002).

standing.  524 U.S. at 433 n.22 ("[A] denial of a benefit in the bargaining process can itself create an Article III injury . . . .").  Here, too, Plaintiffs do not challenge the ability to voluntarily include PLAs in projects, but they instead challenge the withdrawal of a government-imposed requirement that previously strengthened their bargaining power.  That is a sufficient injury to establish standing.

Plaintiffs have also shown that this impairment has an alleged direct effect on their members' ability to participate in federal contracting, satisfying *Lujan*'s requirement that the injury be personal and specific.  504 U.S. at 563.  Plaintiffs' injury is not a generalized grievance about agency policy; it is instead a concrete interference with a recurring practice of negotiating PLAs in response to agency solicitations.  By demonstrating how the memoranda caused the withdrawal of specific PLA terms from active solicitations on which they were actively negotiating, Plaintiffs have sufficiently tied the alleged injury directly to Defendants' conduct— the issuance of the memoranda.

Thus, Plaintiffs' alleged injury is neither hypothetical nor generalized, but immediate and particularized, and ongoing.  It flows directly from the memoranda's effect on federal contract practices for large-scale projects, which now direct contracting officers to omit PLA requirements from future solicitations without engaging in the individualized exception analysis mandated by the EO.  This shift undermines Plaintiffs' ability to secure PLAs not only for specific ongoing projects, but it also affects Plaintiffs' ability across the full spectrum of future large-scale federal construction projects.  The deprivation of this regulatory "bargaining chip" mirrors the harm recognized as cognizable in both *Clinton* and *Allbaugh*.  Taken together, the holdings in these cases confirm that when a government action strips away a statutory or regulatory structure that meaningfully enhances a party's negotiating power—as Plaintiffs allege

occurred here—standing is established.  Plaintiffs have substantiated this harm with concrete examples of halted negotiations and the demonstrable weakening of their bargaining position. Accordingly, Plaintiffs have adequately alleged a cognizable injury in fact under Article III.

## 2.  Causation

Second, in order to establish standing, a plaintiff must show that his injury in fact is "fairly traceable" to the challenged action of the defendant.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  The injuries must flow from Defendants' actions and cannot be the "result [of] the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 561 (alteration in original) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).  The Supreme Court has held that plaintiffs attempting to show causation generally cannot "rely on speculation about the unfettered choices made by independent actors not before the courts."  *Clapper v. Amnesty Int's USA*, 568 U.S. 398, 415 n.5 (2013) (quotation marks omitted); *see also Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).  Therefore, the plaintiff must show that the "third parties will likely react in predictable ways" that in turn will likely injure the plaintiffs.  *California v. Texas*, 593 U.S. 659, 675 (2021) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)).

Plaintiffs argue that their injury is directly traceable to the Defendants' actions— specifically, the issuance of memoranda by the DoD and GSA removing the mandatory inclusion of the PLA requirement on large-scale construction projects.  Pls.' Reply at 10–11.  Plaintiffs argue that this policy shift altered the bidding process and weakened Plaintiffs' bargaining position, as contractors were no longer required to negotiate PLAs with unions.  *Id.*  Plaintiffs cite an example where a contractor ceased PLA negotiations following the issuance of the memoranda, underscoring the immediate and foreseeable impact of the policy change.  *Id.* at 11.

They stress that this harm stems from Defendants' actions, not the contractors' independent decisions. *Id.* at 10–11. Defendants counter that Plaintiffs cannot establish causation because the memoranda do not directly regulate Plaintiffs' actions or affect their ability to negotiate PLAs with willing contractors. Defs.' Opp'n at 14–15. Plaintiffs' injury, Defendants argue, hinges on whether contractors choose to negotiate PLAs with the unions, which depends on various factors, including economic considerations. *Id.* Thus, Defendants argue, this independent decision by the contractors not to include PLAs in their solicitation bids constitutes an independent decision by third parties, which breaks the causal chain required for standing. *Id.* Again, Plaintiffs have the better argument.

Plaintiffs have sufficiently demonstrated that their injuries are "fairly traceable" to Defendants' issuance of the memoranda because those injuries are not the result of "the independent action of some third party not before the court," but rather flow in a direct and predictable manner from the challenged policy change. *Lujan*, 504 U.S. at 561 (cleaned up). Plaintiffs do not rely on speculative predictions about contractor behavior; instead, they identify a specific instance where a contractor ceased negotiating PLAs immediately after the issuance of the DoD and GSA memoranda. Pls.' Reply at 11. And this is a natural and probable consequence of the elimination of a requirement that solicitations must include a mandate to negotiate PLAs. This pattern of conduct illustrates that third parties reacted in "predictable ways" to the removal of the mandatory PLA requirement, satisfying the traceability standard articulated in *California v. Texas* and *Department of Commerce v. New York*. While Defendants argue that the causal chain is broken by the independent decision-making of contractors, Plaintiffs have shown a "predictable chain of events leading from the government action," here, the purported revocation of the PLA requirements, "to the asserted injury," the contractors

choosing not to negotiate PLAs now that they are no longer required to do so. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024). Because Plaintiffs have shown that the policy shift foreseeably and materially weakened their bargaining position within the federal contracting framework, they sufficiently demonstrated the traceability requirement.

### 3. Redressability

The third requirement to establish standing is a showing that the plaintiff's injury will likely be redressed by a favorable decision by the Court. *See Lujan*, 504 U.S. at 561. To satisfy the redressability requirement for injunctive relief, a plaintiff must show it is "likely, as opposed to merely speculative," that a favorable court decision will remedy their injury, *see id.* (internal quotation marks omitted), and such redress cannot depend on the actions of third parties not before the court¸ *see Haaland v. Brackeen*, 599 U.S. 255, 291–94 (2023). Additionally, plaintiffs must demonstrate a continuing or imminent injury—not merely a past harm—to justify forward-looking relief like an injunction. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983). However, a plaintiff need not "negate . . . speculative and hypothetical possibilities . . . in order to demonstrate the likely effectiveness of judicial relief." *Duke Power Co. v. Carolina Envt'l Study Grp., Inc.*, 438 U.S. 59, 78 (1978). Indeed, "a party seeking judicial relief need not show to a certainty that a favorable decision will redress [its] injury." *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C. Cir. 1988).

Plaintiffs argue that their injuries—loss of bargaining leverage in negotiating PLAs due to the challenged memoranda—can be redressed by enforcing the EO through declaratory and injunctive relief. Pls.' Reply at 10–12. They contend that reinstating the presumption in favor of PLAs, as required by the EO, would restore their ability to effectively negotiate PLAs on future federal projects, thereby remedying their injury. *Id.* Plaintiffs emphasize that they are not

seeking a blanket PLA mandate without exceptions, but rather a return to the framework established by the EO, which they claim the memoranda undermined.  *Id.*  Plaintiffs reject Defendants' claim that contractors are still free to voluntarily negotiate PLAs, arguing that without the EO's presumption, their bargaining position is significantly diminished.  *Id.*  By issuing an injunction to set aside the memoranda and require compliance with the EO, Plaintiffs argue that the Court would effectively restore the conditions under which they previously had meaningful leverage.  *Id.*  In contrast, Defendants argue that the memoranda merely influence, rather than dictate, agency behavior and do not categorically prohibit PLAs.  Defs.' Opp'n at 15–16.  Therefore, Defendants assert that enjoining the memoranda would not necessarily result in solicitations including PLA requirements (because the agency can assert exceptions), meaning Plaintiffs would remain vulnerable to the same harms.  *Id.*  Thus, the relief sought would not redress the alleged harm.  *Id.*

Plaintiffs have sufficiently demonstrated redressability by establishing that their asserted injury—diminished bargaining leverage in negotiating PLAs—is likely to be remedied by the relief sought.  While Defendants argue that agency discretion breaks the causal chain, the Supreme Court has made clear that redressability does not require plaintiffs to demonstrate certainty or eliminate all hypothetical alternatives.  *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (noting that plaintiffs "ha[ve] standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant") (emphasis added).  Plaintiffs have identified a specific injury caused by the removal of the EO's presumption in favor of PLAs and have shown that vacating the memoranda and enforcing the EO would likely restore the procedural framework that enhanced their bargaining position.  This is sufficient under the standard articulated in *Lujan*, which requires only that a

favorable decision be "likely, as opposed to merely speculative," to redress the alleged harm. *See* 504 U.S. at 561 (internal quotation marks omitted); *see also Nat'l Wildlife Fed'n*, 839 F.2d at 705 (recognizing that a plaintiff "need not show to a certainty" that relief will redress the injury). Here, an order setting aside the memoranda would re-establish the "bargaining chip" that the EO provides the unions, realigning the agencies and the contractors' conduct with the EO's presumption, and thereby enhancing Plaintiffs' ability to secure PLAs in future large-scale construction contracts. This is not a request for speculative third-party action, but a direct challenge to official action that, if rescinded, would likely restore the prior policy environment under which Plaintiffs previously had greater leverage—making their injury redressable under prevailing precedent.

### B. Likelihood of Success of Plaintiffs' APA Claims

Having established Plaintiffs' standing to raise the claims in this case, the Court turns to their substantive APA claims. The Court begins with the "most important factor" in its preliminary injunction analysis: whether Plaintiffs have demonstrated a "likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The Court concludes that Plaintiffs are likely to succeed on the merits of their APA claims because Defendants' memoranda are not in accordance with the law, as they deviated from the requirements of the EO without providing adequate justification or following the proper exception process.

#### 1. Final Agency Action

As a preliminary matter, Defendants argue that the challenged memoranda are not final agency actions subject to judicial review. Defs.' Opp'n at 16–19. According to Defendants, the memoranda are intermediate steps that merely direct future actions, such as amending or omitting PLA requirements in solicitations for large-scale construction projects, which

solicitations are themselves the final agency actions. *Id.* Defendants further argue that because the memoranda do not impose legal obligations, they fail the Supreme Court's *Bennett* test for finality. *Id.* The Court finds that the memoranda constitute final agency action for purposes of APA review.

It is well established that under the APA, "a court may not review a non-final agency action." *Conservation Force v. Salazar*, 919 F. Supp. 2d 85, 89 (D.D.C. 2013); *see also Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012) ("The APA . . . only provides a right to judicial review of '*final* agency action for which there is no other adequate remedy in a court.'" (quoting 5 U.S.C. § 704)). "An agency action is final if it '1) marks the consummation of the agency's decision making process' and 2) affects the 'rights or obligations . . . [or the] legal consequences' of the party seeking review." *Conservation Force*, 919 F. Supp. 2d at 89 (alterations in original) (quoting *Bennett*, 520 U.S. at 177–78). These two prongs are referred to as the *Bennett* test, and "[a]n order must satisfy both prongs of the *Bennett* test to be considered final." *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). "[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury . . . ." *Darby v. Cisneros*, 509 U.S. 137, 144 (1993) (first alteration in original) (quoting *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193 (1985)). "Agency action is considered final to the extent that it imposes an obligation, denies a right, or fixes some legal relationship." *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003).

In evaluating the first *Bennett* prong, the Court will consider whether the action is "informal, or only the ruling of a subordinate official, or tentative." *Abbott Lab'ys v. Gardner*,

387 U.S. 136, 151 (1967) (citations omitted).  The decisionmaking processes set out in an agency's governing statutes and regulations are key to determining whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue.  *See Holistic Candlers*, 664 F.3d at 944 (relying upon the FDA Manual's description of warning letters as preceding enforcement action to conclude they "do not mark the consummation of FDA's decisionmaking"); *Reliable Automatic Sprinkler*, 324 F.3d at 732–33 (holding a letter interpreting a safety regulation was not a final agency action because "the Commission itself ha[d] never considered the issue," and "[t]he Act and the agency's regulations clearly prescribe a scheme whereby the agency must hold a formal, on-the-record adjudication before it can make any determination that is legally binding"); *see also Sw. Airlines*, 832 F.3d at 275 (considering "the way in which the agency subsequently treats the challenged action" in evaluating finality).  The second prong of the *Bennett* test, as noted, requires the court to decide whether the issuance of the memoranda is an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 178 (internal quotation marks omitted).  This inquiry is a "pragmatic" one.  *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Lab'ys*, 387 U.S. at 149).

   The Court concludes that Plaintiffs have alleged facts sufficient to demonstrate that Defendants' memoranda constitute final agency action within the meaning of the APA.  First, with respect to *Bennett*'s requirement that the action "marks the consummation of the agency's decision making process," *see Conservation Force*, 919 F. Supp. 2d at 89, the memoranda issued by DoD and GSA are plainly not tentative or preliminary.  Rather, they are the agencies' definitive and authoritative positions on the requirement (or now, the lack thereof) for PLAs in their respective procurement processes.  The DoD memorandum directs that, "[e]ffective

immediately, contracting officers shall not use project labor agreements for large-scale construction projects," and further instructs officials to "remove [PLA] requirements, including any solicitation provisions."  *See* DoD Mem.; *see also* Pls.' Reply at 12–13.  This is not an invitation for further deliberation, nor does it permit agency officials discretion to apply the prior PLA policy on a case-by-case basis.  Similarly, the GSA memorandum announces a categorical policy shift exempting an entire class of projects—LPOE projects—from the PLA requirement, concluding that PLAs would not advance the government's efficiency goals for such projects. GSA Mem. at 1–3; *see also* Pls.' Mot. at 16.  These memoranda are thus not intermediate steps in a broader deliberative process; they are final instructions that implement a binding policy and preclude further consideration at the individual solicitation level, absent discrete exceptions. This is the agencies' "last word" on the matter, as confirmed by Defendants' own acknowledgment that the memoranda "announce that the agencies intend not to require PLAs in future solicitations."  *See* Defs.' Opp'n at 10.  Courts have consistently recognized such actions as final under *Bennett*.  *See Mass. Coal. for Immigr. Reform v. DHS*, 621 F. Supp. 3d 84, 101 (D.D.C. 2022) (memorandum constituted final agency action); *see also Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (finding an EPA guidance document that bound officials to a specific approach qualified as final agency action).

Second, under *Bennett*'s requirement that the action "affects the rights or obligations or the legal consequences of the party seeking review," *see Conservation Force*, 919 F. Supp. 2d at 89 (cleaned up), the memoranda have a direct and appreciable impact on legal obligations and practical rights.  By eliminating the requirement that bidders on DoD and GSA projects negotiate PLAs, the memoranda alter the legal framework established by the EO, which mandated that agencies include the PLA requirements on solicitations for large-scale projects absent a project-

specific exception.  The memoranda functionally nullify that mandate in broad swaths of the

agencies' procurement activity—a legal and regulatory shift that has substantial effects.  For

contractors, the memoranda strip them of the necessity to negotiate PLAs for the major projects

on which they bid, undermining the EO's presumption in favor of PLAs with a blanket

exclusion.  For unions like NABTU and its affiliates, the change removes a critical bargaining

lever—the PLA mandate—that enabled them to negotiate labor terms with potential bidders as a

condition of participating in federal projects.  That deprivation constitutes a legally cognizable

injury under *Bennett*, as it "presently and directly limits or defeats a party's ability to enter into

an advantageous business arrangement."  *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d

1247, 1252 (D.C. Cir. 2021).

Moreover, the practical implementation of these memoranda confirms their legal effect.

Plaintiffs have submitted declarations showing that actual solicitations—including those for the

Marine Barracks project in D.C. and the USDA Dairy Forage Research Center in Wisconsin—

were amended in reliance on the memoranda to remove PLA requirements.  *See, e.g.*, McGarvey

Decl. ¶ 16; Akerman Decl. ¶ 10.  Contractors ceased PLA negotiations, and unions like NABTU

lost opportunities to engage with bidders under the framework contemplated by the EO.

McGarvey Decl. ¶ 16.  These changes are not hypothetical or speculative; they have already

materialized and produced a direct and adverse impact on Plaintiffs' interests.  This distinguishes

the memoranda from the nonbinding guidance at issue in *Southern California Alliance of*

*Publicly Owned Treatment Works v. EPA*, 8 F.4th 831, 837 (9th Cir. 2021) cited by Defendants,

where no concrete consequences flowed from the guidance itself.  Here, by contrast, the

memoranda use imperative language, compel changes to active solicitations, and eliminate

mandatory contractual conditions.  As in *Public Employees for Environmental Responsibility v.*

*National Park Service*, No. 19-cv-3629, 2021 WL 1198047, at *8 (D.D.C. Mar. 30, 2021), where a National Park Service directive regarding e-bikes was found final because it imposed binding requirements on park officials, the DoD and GSA memoranda likewise impose immediate obligations on agency officials and reshape the legal landscape for affected stakeholders.

The Court finds that both prongs of the *Bennett* test are satisfied. The memoranda are final agency actions because they (1) constitute the culmination of DoD and GSA's decision-making regarding PLA requirements and (2) carry binding legal consequences that alter rights, obligations, and economic relationships between the agencies, contractors, and labor organizations. As such, the Court finds that judicial review under the APA is appropriate.

### 2. Accordance with the Law

Having established that the issuance of the memoranda constitutes final agency action subject to APA review, the Court turns to the substantive APA claims. Plaintiffs argue that the DoD and GSA violated the APA by issuing memoranda that contradict the EO. Pls.' Mot. at 17–20; Pls.' Reply at 16–18. Plaintiffs contend that, instead of following the major contract solicitation process mandated by the EO, the agencies implemented sweeping class deviations or exceptions that effectively nullify the PLA requirement across all future projects, in direct conflict with the EO's plain language and implementing regulations. Pls.' Mot. at 17–20. Plaintiffs further argue that the justifications offered by Defendants for their sweeping class deviations—such as the potential for bid protests or labor market concerns—do not satisfy the stringent exception criteria outlined in the EO or the FAR. Pls.' Reply at 18–20. Defendants counter that the GSA and DoD memoranda are not contrary to law because neither the EO nor its implementing regulations prohibit class deviations, and that such deviations are authorized under the FAR unless explicitly precluded, which is not the case here. Defs.' Opp'n at 19–23.

Defendants also contend that the DoD memorandum is not arbitrary and capricious because it was issued in response to an urgent need to prevent significant delays in future large-scale projects, citing recent legal decisions and market research. *Id.* at 21–22. Finally, Defendants emphasize that the EO is not judicially enforceable, further undercutting Plaintiffs' claims. *Id.* at 21 n.3. Again, Plaintiffs have the stronger argument.

Under the APA, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A)), or when it exceeds statutory authority, *id.* § 706(2)(C)). Because that standard turns on the evidence and law before the agency, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "The entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted). The challenging party bears the burden of establishing that the agency action violated the APA. *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

Agencies are bound to follow binding executive orders unless rescinded or overridden through lawful procedures. *See Ass'n for Women in Sci. v. Califano*, 566 F.2d 339, 344 (D.C. Cir. 1977*); see also Allbaugh*, 295 F.3d at 33. In this context, the EO is akin to a regulation. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 2025 WL 1187730, at *18 (D.D.C. Apr. 24, 2025) ("Some executive orders, like legislative rules, purport to create binding, enforceable obligations on their own." (internal citation omitted)). Evaluating a claim that agency action is contrary to law, then, necessarily involves interpreting the language of the EO. As when interpreting regulations, the "court must exhaust all the traditional tools of

construction"—considering the law's "text, structure, history, and purpose." *Kisor v. Wilkie*, 588

U.S. 558, 575 (2019) (internal quotations marks omitted).

The Court finds that the memoranda are contrary to the law set forth in the EO because

they flatly contradict the unambiguous requirements of the EO and its implementing regulations,

in direct violation of the APA.  Under 5 U.S.C. § 706(2)(A), as noted, courts must set aside

agency action that is "not in accordance with law."  Here, the memoranda issued by DoD and

GSA effectively nullify the mandatory PLA requirement imposed by Section 3 of the EO, which

states that "agencies shall require" PLAs on large-scale federal construction projects unless a

particularized, contract-specific exception is properly documented before the solicitation date.

*See* Sec. 3, Exec. Order 14,063, 87 Fed. Reg. at 7364.  These memoranda instead purport to

establish blanket class deviations and class exceptions—a legal maneuver explicitly foreclosed

by the language of the EO as reinforced by the FAR.

These set of facts are analogous to those found in *National Wildlife Federation v.*

*Morton*, 393 F. Supp. 1286 (D.D.C. 1975), where the Bureau of Land Management's broad

designation of open land for off-road vehicle ("ORV") use, made without regard to the specific

criteria mandated by an executive order, was found to be not in accordance with law.  *Id.* at

1292.  Like the blanket ORV access conditions that were intended to be imposed in *Morton*,

DoD and GSA's memoranda impose categorical rules that override the individual, case-by-case

decision-making process explicitly required by the EO.  In both cases, the agencies abandoned

the individualized, criteria-based analysis mandated by the relevant EO in favor of sweeping

generalizations inconsistent with that authority.

Further, the memoranda are legally impermissible under the FAR.  While class deviations

from procurement regulations are sometimes allowed under FAR 1.401 and 1.404, they are

categorically barred if "precluded by law, executive order, or regulation."  *See* FAR 1.402, 48

C.F.R. § 1.402.  Like Plaintiffs articulate, the EO plainly precludes class deviations by requiring

that any exceptions to the PLA mandate be made "for a particular contract" and only by "no later

than the solicitation date," accompanied by a "specific written explanation."  Exec. Order

No. 14,063, 87 Fed. Reg. at 7364; Pls.' Mot. at 18–19.  The FAR Council, in implementing the

EO, explicitly reaffirmed this requirement, stating in the Federal Register that only "case-by-

case" exemptions are permissible.  Federal Acquisition Regulation: Use of Project Labor

Agreements for Federal Construction Projects, 88 Fed. Reg. 88708, 88712, 88715, 88717, 88719

(Dec. 22, 2023) (codified at 48 C.F.R. pts. 1, 7, 22, 36, 52).  Thus, DoD's and GSA's actions—

which apply a wholesale exemption to all large-scale or LPOE projects, respectively—directly

violate not only the EO but also the binding procurement regulations issued to enforce it.

The Ninth Circuit's analysis in *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225

(9th Cir. 2018) further confirms this Court's conclusion.  In *City & County of San Francisco*, the

Department of Justice attempted to mitigate the legal consequences of a judicial injunction by

issuing a memorandum that effectively neutralized a binding executive order penalizing

sanctuary cities.  *Id.* at 1240–41.  The circuit court rejected this post hoc effort to rewrite the law,

holding that agencies may not "render[] the Executive Order a toothless threat" by adopting

interpretations inconsistent with its plain terms.  *Id.*  Similarly, here, DoD and GSA cannot

sidestep the EO's prescriptive PLA mandate through internal memoranda that fundamentally

alter its legal effect.

Finally, Defendants' reliance on the *MVL USA, Inc. v. United States*, 174 Fed. Cl. 437

(Fed. Cl. 2025) decision is misplaced.  The *MVL USA* holding was limited to the specific

procurements before the Court of Federal Claims, and it expressly stated that its conclusions did

not apply to unrelated solicitations.  *MVL USA*, 174 Fed. Cl. at 441, 463 (limiting the court's

holding to "the functionality of the mandate *as applied to the individual contracts in this case*"

and to "FAR requirements [for PLAs] in the solicitations . . . *as applied to the contracts at issue

here*" (emphases added)).  Indeed, in a decision on the request for reconsideration of a bid protest

decision, the Government Accountability Office reaffirmed this limited scope, finding that

*MVL*'s analysis was nonbinding on future procurements.  Decision at 4, *4K Global-ACC JV,

LLC*, B-423092.2 (Comp. Gen. Apr. 11, 2025), available at

https://www.gao.gov/assets/880/876975.pdf ("In any event, even if we were to accept that the

*MVL USA* court's interpretation of the PLA requirements had any bearing on our Office's review

of a protest challenging an agency's PLA evaluation, nothing in the court's decision indicates

that its interpretation would apply to the award here.").  Thus, Defendants cannot rely on *MVL

USA* as justification for wholesale noncompliance with the EO.

Because the memoranda constitute final agency actions that disregard the EO's legal

requirements, rely on unauthorized class deviations or exceptions, and rest on a misreading of

*MVL USA*, the Court finds that the memoranda are not in accordance with law under the APA.

Again, agencies are bound by executive orders until they are rescinded or overridden through

lawful procedures.  *See Califano*, 566 F.2d at 344; *see also Allbaugh*, 295 F.3d at 33.  Here, the

EO was neither rescinded nor overridden.  As such, the Court finds that Plaintiffs have

demonstrated a substantial likelihood of establishing that the memoranda are contrary to law and

violate the APA.

## C.  Irreparable Harm

Moving to the next prong of the preliminary injunction analysis, Plaintiffs argue that,

absent a preliminary injunction, they will suffer irreparable harm because Defendants'

memoranda obstruct their ability to negotiate and implement PLAs for large-scale construction projects. Pls.' Mot. at 21–23. The Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). This is because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course" or where "a less drastic remedy . . . [is] sufficient to redress" the plaintiffs' injury. *Id.* Beginning with irreparable harm—and for the additional reasons set forth below—the Court finds that the Plaintiffs have independently demonstrated that an injunction is necessary to secure the relief to which they are entitled.

Plaintiffs argue that the memoranda have already disrupted ongoing and potential PLA negotiations, causing lasting damage to collective bargaining relationships. Pls.' Mot. at 21–23. They contend that without injunctive relief, this harm will continue and cannot be reversed once contracts are awarded. *Id.* In response, Defendants reiterate many of their arguments on standing, claiming that Plaintiffs cannot demonstrate irreparable harm because their alleged injury is speculative, not imminent, and not directly caused by the challenged DoD and GSA memoranda. Defs.' Opp'n at 23–24. Defendants reason that the memoranda do not bar Plaintiffs from negotiating PLAs since such decisions lie with prospective contractors. *Id.*

The Court finds that Plaintiffs have also made a sufficient showing of irreparable harm. In order to demonstrate irreparable harm, a plaintiff must demonstrate that its alleged injury is "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (cleaned up). The "possibility" of irreparable harm is not enough. *See Winter*, 555 U.S. at 22. The moving party must demonstrate "a clear and present need for equitable relief to prevent

irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks omitted). The Court has already concluded that Plaintiffs have established a substantial likelihood that they face an injury that is imminent enough to provide them with the legal right to file an action in federal court alleging that Defendants have violated the APA. Therefore, the Court's assessment of whether Plaintiffs have shown that they are likely to face irreparable harm absent a preliminary injunction will focus first on whether the harm alleged is sufficiently severe to compel the conclusion that interim injunctive relief is warranted, and then on whether the harms Plaintiffs allege could be otherwise remedied.

Plaintiffs have sufficiently shown that without declaring that the memoranda are unlawful and an injunction to prevent their enforcement, imminent harm is unavoidable. The harm at issue is not speculative or remote; rather, it is concrete, immediate, and directly traceable to the issuance of Defendants' memoranda. First, this kind of injury squarely meets the requisite irreparable harm standard because Plaintiffs' harm is certain and great, actual, and imminent. *See League of Women Voters*, 838 F.3d at 8. Plaintiffs have sufficiently demonstrated that they are currently experiencing concrete disruptions in PLA negotiations—disruptions that are traceable to agency action and not within the Plaintiffs' control to remedy. Defendants' argument that the harm is speculative overlooks the fact that the PLA mandate functioned as a bargaining lever. Its removal changes the entire negotiating landscape, leaving NABTU and its affiliates in a substantially weakened position that undermines their statutory and contractual role in large-scale federal construction projects.

Moreover, the D.C. Circuit has repeatedly recognized that interference with collective bargaining rights constitutes irreparable harm. In *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 428–29 (D.C. Cir. 1992), the court acknowledged the unique and irreversible

nature of harms associated with the procurement process—once a contract is awarded without the application of a PLA, neither the opportunity to negotiate nor the benefits conferred by such agreements can be retroactively imposed.  This principle reinforces the irreparability of the injury in this case: once solicitations are amended and contracts awarded, Plaintiffs' opportunity to influence project labor conditions vanishes.

Plaintiffs also cite to *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir. 1987), which underscores the principle that harm to the collective bargaining process itself is irreparable.  The Court agrees.  The loss of bargaining power, particularly the mandated context within which such bargaining historically occurred under the EO, cannot be restored through damages or later litigation.  This aligns with *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30, 50 (D.D.C. 2013), where damage to ongoing contractual relationships was found to support injunctive relief.  Here, Plaintiffs show not only lost opportunities on specific projects, but also a broader chilling effect on contractor willingness to engage in future PLA negotiations, disrupting established and economically significant union-contractor relationships.  *See, e.g.*, McGarvey Decl. ¶ 16; Akerman Decl. ¶ 10.

The Court also finds that Defendants' failure to persuasively dispute that the elimination of the PLA mandate weakens Plaintiffs' bargaining position only underscores Plaintiffs' showing of irreparable harm.  Courts have found that diminished negotiating leverage—especially where it stems from unlawful or procedurally flawed government action—constitutes a harm that is both "actual" and "beyond remediation."  *League of Women Voters*, 838 F.3d at 8.  Accordingly, the facts presented by Plaintiffs demonstrate irreparable harm and support the conclusion that a preliminary injunction is necessary to prevent further injury that cannot be undone through post hoc judicial remedies.  Because the removal of the PLA mandate has already interfered with

specific negotiations and threatens NABTU and its affiliates' core organizational purpose, this qualifies as irreparable harm.

### D. Balance of Equities and Public Interest

The final two factors—balancing the equities and the public interest—also support granting the preliminary injunction. Plaintiffs argue that enjoining the challenged memoranda serves the public interest because it ensures agency compliance with the APA and prevents enforcement of an unlawful, arbitrary directive. Pls. Mot. at 23. They emphasize that they are not asking the Court to mandate the use of PLAs or issue a generalized "obey the law" injunction. Pls.' Reply at 24. Instead, Plaintiffs seek a specific injunction prohibiting Defendants from enforcing memoranda that override the binding EO, and they assert that Defendants would still retain discretion to grant exceptions under the EO on a case-by-case basis. *Id.* Defendants counter that the balance of equities favors the government because Plaintiffs face no real injury, while an injunction would improperly restrict procurement officers' discretion and disrupt lawful government operations. Defs.' Opp'n at 24–25.

When assessing the equities and public interest factors, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. If the movant seeks to enjoin the government, the final two factors merge "because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. In contrast, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (internal quotation marks omitted).

30

Applying these principles here, the equities and public interest both favor an injunction. An injunction ensures that Defendants abide by the procedural and substantive requirements of the EO and the APA and halts any unlawful action in implementing memoranda that effectively nullify the EO's mandate. Defendants' claimed harm—reduced flexibility in procurement discretion—is minimized where the EO already permits case-by-case exemptions, which Plaintiffs do not seek to eliminate. Thus, the requested injunction does not constrain lawful discretion but merely prevents the enforcement of an unlawful categorical exclusion.

Importantly, Plaintiffs are not seeking to compel agency action unlawfully withheld or to substitute the Court's judgment for agency expertise; they are simply seeking to preserve the status quo as defined by a duly issued Executive Order until the legality of the new memoranda is fully adjudicated. This is precisely the type of limited, specific injunctive relief the courts have authorized to maintain legal compliance without overstepping judicial boundaries. *See United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (distinguishing enforceable, specific injunctions from improper "obey the law" directives).

Preserving fairness and accountability in governance serves the public interest. Therefore, the final two factors warrant injunctive relief.

### E. Scope and Implementation of Injunctive Relief

#### 1. Vacatur as the Appropriate Remedy

When a rule is contrary to law, the "ordinary practice is to vacate" it. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *see also* 5 U.S.C. § 706(2) (noting that the "reviewing court shall . . . set aside" unlawful agency action). The D.C. Circuit has "made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual

petitioners is proscribed.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399,

1409 (D.C. Cir. 1998) (alteration in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495

n.21 (D.C. Cir. 1989)). The Court, accordingly, concludes that the proper remedy is to set aside

the DoD and GSA memoranda, and the legal consequences of that result are not limited "to the

individual" Plaintiffs. *Id.*

### 2. Waiver of Bond Requirement

Finally, the Court will not require a bond. Under Federal Rule of Civil Procedure 65(c),

the court may issue a preliminary injunction "only if the movant gives security in an amount that

the court considers proper to pay the costs and damages sustained by any party found to have

been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, Rule 65(c) gives this

court broad discretion to determine the appropriate amount of an injunction bond. *DSE, Inc. v.

United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). This includes "the discretion to require no bond

at all." *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020)

(quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)); *Nat'l Council

of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C.

Feb. 25, 2025) ("A bond is not necessary where requiring one would have the effect of denying

the plaintiffs their right to judicial review of administrative action." (cleaned up)).

Requiring security in this case would serve no meaningful purpose, as Defendants have

not sufficiently demonstrated any likelihood of suffering costs or damages if they are later found

to have been wrongfully enjoined. Defendants have failed to identify any tangible financial

harm—let alone quantifiable costs—they would incur as a result of being temporarily restrained

from enforcing the challenged policy. In cases where the government is the enjoined party and

no concrete economic injury is established, as is the case here, courts routinely waive the bond

requirement.  *See, e.g.*, *P.J.E.S.*, 502 F. Supp. 3d at 520.  Moreover, imposing a bond could unduly burden Plaintiffs and potentially impair their ability to seek judicial relief, a concern that courts have repeatedly recognized in declining to require bonds in public interest litigation.  *See id.*; *Nat'l Council of Nonprofits*, 2025 WL 597959, at \*19.  The same rationale applies here. Where the risk of financial harm is speculative at best and where a bond would have a chilling effect on access to justice, the balance of equities firmly supports waiving the bond.  As such and consistent with this Court's broad discretion under Rule 65(c), no bond will be required.

## VI.  CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for preliminary injunction. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 16, 2025                                                     RUDOLPH CONTRERAS
                                                                                    United States District Judge